# ORIGINAL

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

ROBERT J. FILECCIA, ESQ. and
RICHARD FILECCIA,

                              Plaintiffs

     -against-

THE CITY OF NEW YORK;
DISTRICT ATTORNEY DANIEL DONOVAN;
FORMER DISTRICT ATTORNEY WILLIAM MURPHY;
FORMER ACTING DISTRICT ATTORNEY DAVID W. LEHR;
DAVID FREY;
KAREN VARRIALE;
MARIO MATTEI;
ELIZABETH WATTS;
JOHN/JANE DOE ASSISTANT DISTRICT ATTORNEYS;
STEVEN ORLANDO;
LORI ELLEN ORLANDO A/K/A LORIELLEN KEISER;
DATA COMM CONSULTING GROUP INC.;
1276 CASTLETON REALTY CO., L.L.C.;
POLICE COMMISSIONER RAYMOND KELLY;
NYPD DETECTIVE GEORGETTE ROMAGNANO;
NYPD LIEUTENANT MICHAEL L. PACCIONE;
NYPD SERGEANT MICHAEL J. BOTTA;
NYPD SERGEANT GENTILE;
NYPD SERGEANT VIOLA;
NYPD SERGEANT OBOKKOBITS;
NYPD POLICE OFFICER SILVERIO;
NYPD DEPUTY CHIEF JACK J. TRABITZ;
NYPD SERGEANT PHILLPOTTS;
JOHN/JANE DOE POLICE OFFICERS;
NYC COMPTROLLER WILLIAM THOMPSON;
MICHAEL AARONSON;
KEVIN BRYANT;
ROBERT HOWE;
BEN SAMUEL;
GEORGE E. FILIPPIDES;
EMERSON L. FORDE;
BRUCE EVANS KNOLL;
MICHAEL SANDLER;
LORAINE K. WILSON;
BENJAMIN BRAFMAN;
BRAFMAN & ROSS, P.C.;
BRAFMAN AND ASSOCIATES, P.C.;
MARK M. BAKER;

**CV 10 - 0889**

**COMPLAINT**

**JURY TRIAL
DEMANDED**

**ROSS, J.**

**BLOOM, M.J.**

RECEIVED
MAR 01 2010
**PRO SE OFFICE**

1

ALEX SHULMAN A/K/A ALEX HEDY SHULMAN;                    :
ALISTAIR T. ABERNETHY;                                   :
ANN T. ABERNETHY A/K/A ANN T. JUNIOR;                    :
LYDIA A. BOYANCE A/K/A LYDIA ALISON BOYANCE;             :
ISABEL CORNIER A/K/A ISABEL LORENZO CORNIER;             :
ALLYN J. CRAWFORD                                        :
GEORGETTE A. EDKINS;                                     :
PATRICIA H. GOEBEL;                                      :
FRANK W. GOEBEL;                                         :
EDWARD A. JOHNSON;                                       :
DARLENE ANN JOHNSON A/K/A DARLENE BULLOCK;               :
JULIA A. KING A/K/A JULIA ANN KING;                      :
FRANK ORLANDO A/K/A FRANK ANTHONY ORLANDO;               :
AIDE ROSADO A/K/A HAIDE ROSADO;                          :
GEORGE W. STAPLETON;                                     :
FRANK M. STAPLETON;                                      :
EILEEN TRITTO A/K/A EILEEN JUNIOR;                       :
SIDRA M. VAZQUEZ A/K/A SIDRA M. CARDIERI;                :
DIANE E. VINES A/K/A DIANE E. MONOHAN;                   :
WALTER VINES;                                            :
JOHN G. HALL;                                            :
THE LAW FIRM OF HALL & HALL LLP;                         :
SI BANK & TRUST;                                         :
SI BANK & TRUST FOUNDATION;                              :
THE STATEN ISLAND FOUNDATION;                            :
SOVEREIGN BANK;                                          :
SOVEREIGN BANCORP, INC.;                                 :
BANCO SANTANDER;                                         :
LORRAINE M. STERGIOUS A/K/A LORRAINE M. KENNY;           :
THOMAS P. BURNS;                                         :
NINO GIOVANNI CUTILLO;                                   :
STEVEN J. DEMIZIO A/K/A STEVEN J. DEMIZIO, SR.;          :
ROBERT A. GIROD, JR.;                                    :
JOHN LOIACONO;                                           :
PAUL NICHOLSON;                                          :
WALTER E. PARKS;                                         :
ERIC T. PAULSEN;                                         :
MICHAEL A. PRZYBYSZEWSKI;                                :
STEVEN M. REISS;                                         :
NICHOLAS J. WILLIAMS;                                    :
                                                         :
                    Defendants.                          :
-----------------------------------------------------------------X

<u>Pro</u> <u>se</u> indigent Plaintiffs ROBERT J. FILECCIA, ESQ., being an attorney at law, duly admitted to practice in the courts of New York, and RICHARD FILECCIA complaining of the Defendants respectfully affirm the following allegations to be true under the penalty of perjury:

1.    This affirmation is based upon personal knowledge, sworn testimony, upon information and belief, and other evidence the sources of which include:

    a) Independent investigations performed by licensed private investigators including former FBI Agents, United States Postal Inspectors,  and chief of detectives assigned to the FBI's Violent Crime Task Force in Albany, Brooklyn, Bronx, Manhattan, Long Island, Queens, Staten Island, Pennsylvania, Reno Nevada, among other places;

    b) A COMPLAINT filed on February 5, 2010, in United States District Court Eastern District of New York, <u>Robert J. Fileccia v. The City of New York et al</u>., Case No. 1:2010cv00530, that is assigned to Hon. Allyne R. Ross and was referred to Hon. Robert M. Levy, which we respectfully incorporate by reference into this Complaint;

    c) All pre-trial and trial proceedings in Richmond County Indictment No. 62/2002, <u>People v. Robert Fileccia and Richard Fileccia</u> hereinafter denominated "The 309-Count Car Indictment," including but not limited to the grand jury minutes and exhibits that terminated on February 27, 2007 in favor of the accused, which we respectfully incorporate by reference into this Complaint.  **The 309-Count Car Indictment is the basis of this Complaint;**

    d) All pre-trial and trial proceedings in Richmond County Indictment No. 23/2004, hereinafter denominated "The Tax Indictment," that was severed into two trials, <u>People v. Richard Fileccia, et al</u>. and <u>People v. Robert Fileccia</u>, the latter proceeding having gone to trial and terminated on February 7, 2007 in favor of Plaintiff Robert J.

Fileccia, Esq. Plaintiffs' respectfully incorporate by reference all pre-trial and trial proceedings for Indictment 23/2004 into this Complaint including but not limited to the grand jury minutes, exhibits, trial transcripts, and witness list;

e) All proceedings relative to a CPLR Article 13A civil forfeiture case <u>William Murphy v. Robert Fileccia, Richard Fileccia, and CPA Motor Cars Ltd.</u>, Index No. 8103/2002, hereinafter denominated "Civil Forfeiture Case No. 1" that terminated on August 20, 2007 in favor of the accused when prosecutors voluntarily abandoned their fraudulent accusations with prejudice, which we respectfully incorporate by reference into this Complaint. Civil Forfeiture Case No. 1 is not the basis of the instant Complaint. A separate civil rights law suit will be filed in this Court on or before August 20, 2010.

f) All proceedings relative to a CPLR Article 13A civil forfeiture case <u>Daniel Donovan v. Robert Fileccia</u>, Index No. 12140/2004, hereinafter denominated "Civil Forfeiture Case No. 2" that terminated on August 20, 2007 in favor of the accused when prosecutors voluntarily abandoned their fraudulent accusations with prejudice, which we respectfully incorporate by reference into this Complaint. Civil Forfeiture Case No. 2 is not the basis of the instant complaint. A separate civil rights law suit will be filed in this Court on or before August 20, 2010.

g) All proceedings relative to a CPLR Article 13A civil forfeiture case <u>Daniel Donovan v. Richard Fileccia</u>, Index No. 12141/2004, hereinafter denominated "Civil Forfeiture Case No. 3" that terminated on August 20, 2007 in favor of the accused when prosecutors voluntarily abandoned their fraudulent accusations with prejudice, which we respectfully incorporate by reference into this Complaint. Civil Forfeiture Case No. 3 is not the basis of the instant complaint. A separate civil rights law suit will be

filed in this Court on or before August 20, 2010.

h) More than seventeen thousand (17,000) Bates-stamped exculpatory documents seized by the NYC Police Department on March 19, 2002 during a break in—warrantless search and seizure—at 496 Willowbrook Road in Staten Island, New York, hereinafter denominated "The Stolen Fileccia Records."

## JURISDICTION AND VENUE

2.    This action arises under the Constitution of the United States, particularly the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment to the Constitution of the United States through the Civil Rights Act, Title 42 U.S.C. § 1983 as well as Article I, §§6 and 11 of the New York State Constitution, for the violation of the Plaintiffs' civil and constitutional rights.

3.    This Court has jurisdiction over this action under 28 USC §§ 1331 and 1343.

4.    This Court also has supplemental, ancillary and pendant jurisdiction to adjudicate all claims asserted under state law herein under 28 USC §§ 1367.

5.    The acts and transactions constituting the civil rights and constitutional violations occurred in the Richmond County, in the Eastern District of New York.  In addition, the Defendants reside, are found, have agents, or transact their affairs in the Eastern District of New York.  Venue is therefore proper in this district pursuant to 28 USC §§ 1391 (b).

## INTRODUCTION TO THE CLAIM

*"Heavenly Father, bless us today as we meet in friendship and duty. May the words that follow challenge those who link organized crime with legitimate business throughout our State. And Lord whatever dangerous endeavors those among us may take to expose crime, let them never be without Your*

5

*sanctuary. But we all know in our hearts that even though we walk through the valley of the shadow of death, You are with us guiding and protecting us. In Jesus' name we pray, amen."*

6.  On August 17, 1998, Hon. Roslynn R. Mauskopf, then New York State Inspector General, requested a joint investigation with Attorney General Dennis Vacco of a corrupt DMV Inspector Bernard "Whitey" Napoli.

7.  The investigation was sparked by a criminal complaint filed by attorney Robert J. Fileccia who accused Napoli of extortion.

8.  On September 10, 1999, Hon. Roslynn R. Mauskopf issued a press release indicating that "On April 8, 1999, Napoli was arrested by the Queens County District Attorney on 43 criminal charges, including 15 counts of felony bribe receiving … resigned his position with the DMV, and on June 26, 1999, he pleaded guilty to one felony count of bribe receiving."

9.  DMV Director Michael Sandler and his Inspectors laid in wait for retribution against attorney Robert J. Fileccia, who instructed his brother to take before-and-after photographs of the repairs he performs at his repair shop in preparation for DMV retaliation.

10. In October of 2001, "Operation Shame on You" was a black operation that was dubbed and implemented by the Richmond County District Attorney's Office against two innocent United States Citizens, Robert and Richard Fileccia.

11. The operation masqueraded as a **309-Count** Enterprise Corruption Indictment whose objective was to steal money to finance the District Attorney's continuing criminal enterprise.

12. The record evidence indicates it was sanctioned and backed by State Supreme Court

6

Judges.

13. Assistant District Attorney David Frey was the desk officer having fabricated the indictment, <u>People v. Robert Fileccia and Richard Fileccia</u>, No. 62/2002 that was unsealed on March 20, 2002.

14. Investigations reveal that Assistant District Attorney David Frey set up a surveillance team within blocks of Plaintiff Richard Fileccia's auto repair shop in Staten Island

15. ADA Frey deployed "runners"—including DMV Inspector George Filippides and NYPD Lieutenant Michael Paccione—to surreptitiously solicit and recruit Richard Fileccia's customers as they entered or exited his repair shop offering them various bribes to join the District Attorney's black operation. DMV records reveal that Inspector George Filippides worked with convicted co-worker Bernard "Whitey" Napoli.

16. ADA Frey also established a Mail Theft Operation to intercept, steal and destroy his victims' mail.

17. The specific allegations of the indictment: first, that Richard Fileccia, auto mechanic, charged customers for repairs not made; second, that Robert Fileccia, real estate lawyer, then sued these customers for payment in small claims court.

18. Almost immediately, the operation went sideways and had to be shut down and tied off. ADA Frey bungled his illegal entry operation by executing a warrantless break-in at 496 Willowbrook Road in Staten Island and leaving behind the victims' photograph negatives that were detailed before-and-after photographs of the auto repairs complained of. Not only did the photographs prove that all the repairs were in fact made—but <u>when</u> they were made—because of the newspaper Richard Fileccia used to catch oil and lay parts on.

19.   Armed with the photographs, Plaintiffs' licensed private investigators picked apart the District Attorney's case exposing widespread crime, including ADA David Frey's Mail Theft Ring.

20.   In August of 2002, Plaintiff Robert J. Fileccia, Esq. became an agency priority target. ADA Frey knew his manufactured 309-Count Car Indictment was in a death spiral and contacted the NYC Department of Finance to develop a plan 'to get Robert Fileccia' and set him up for tax evasion. DA Donovan approved and ratified the plan even though almost everything in it was illegal. On January 30, 2004, the Plaintiffs were indicted for tax evasion based upon perjury and fabricated evidence.

21.   ADA Frey's 17-Count tax evasion indictment was dismissed on February 7, 2007 in favor of Plaintiffs Robert and Richard Fileccia.

22.   ADA Frey's 309-Count Enterprise Corruption Indictment was dismissed on February 27, 2007 in favor of Plaintiffs Robert and Richard Fileccia.

23.   On August 20, 2007, District Attorney Donovan voluntarily withdrew with prejudice his three civil forfeiture proceedings against Robert and Richard Fileccia that originally requested forfeiture of **$1,702,491.50**.

24.   The dismissal of the 309-Count Enterprise Corruption Indictment is the basis of the instant Complaint.

### THE DISTRICT ATTORNEY'S MOTIVE

25.   In the years immediately preceding his retirement, former District Attorney William Murphy created an unconstitutional policy and custom whereby he paid his prosecutors "one time cash payments" based upon their "performance;" i.e. convictions. Murphy's policy encouraged prosecutors to maliciously prosecute innocent United States Citizens

for profit and simultaneously sue them in frivolous civil forfeiture proceedings to generate cash for their personal use.

26. Murphy's unconstitutional policy turned his prosecutors—whose primary duty was to ensure "that justice shall be done"—into PREDATORS.

27. In late 2001, Murphy was in failing health. His chief of staff David W. Lehr announced his intention to run for Staten Island District Attorney against challenger Daniel Donovan, Jr. who was backed and financed by the powerful Rudy Giuliani and his Republicans. Newspaper reports indicated it was "the hottest political competition in town" and was "far larger than a competition between two candidates." Insiders claimed "the Republicans were putting together a major offensive," a war machine, to take control of the Staten Island District Attorney's Office because "no Republican has ever been elected to the post." David Lehr was backed by former Governor Elliot Spitzer who reportedly controlled Albany.



28. Knowing they needed money and headlines to win the election, on March 19, 2002, Murphy and Lehr arrested and imprisoned two innocent United States Citizens, Richard and Robert Fileccia, and charged them with 309 crimes. Richard Fileccia, an auto mechanic, was accused of charging customers for repairs not made.

29.   Murphy and Lehr issued a press release to the Daily News entitled 'EVIL TWINS' INDICTED FOR ENTERPRISE CORRUPTION (emphasis in the original) to rally public support for their campaign.

30.   They seized all of the Fileccia family's money and property—$1,553,888.30—in an unpublicized civil forfeiture law suit even though it was later determined by State Supreme Court Judges Leonard Rienzi and Philip Minardo that only **$5230.13** was in dispute.

31.   Murphy and Lehr did <u>not</u> report any of the seized money to the Division of Criminal Justice Services as required by statute.

32.   Murphy listed himself as the "Claiming Authority" in the forfeiture proceeding and falsely accused the Plaintiffs 85-year-old mother, Virginia Fileccia, with manufacturing, warehousing, or packaging narcotics or marijuana, that State Supreme Court Judge Philip Minardo later *sua sponte* dismissed, in a closed door hearing in Chambers.

33.   On June 23, 2003, defense attorney Herald Price Fahringer presented the Supreme Court with photographs proving that all the repairs complained of were in fact made and—because of the newspaper Richard Fileccia used to catch oil and keep parts on—<u>when</u> they were made.

34.   Murphy and Lehr's illegal campaign fund raising scheme imploded. Newspaper articles revealed that "Lehr ran out of money early in the game ... there was no money coming in ... and he was very vulnerable."

35.   Just two months later, September 17, 2003, Lehr mortgaged his home at 285 Myrtle Avenue in Staten Island for $134,000 and reportedly used the cash trying to save his campaign.

36.  On November 3, 2003, Republican Daniel Donovan Jr. won the election by only 2800 votes, less than a two percent margin.

37.  On January 1, 2004, Murphy left office and took with him $20,082 from city coffers. An article headlined, "Audit: Ex-DA took 'QUESTIONABLE' $$" was front page news.

38.  On January 7, 2005, former NYC Comptroller William Thompson performed an audit of the Richmond County District Attorney's Office that revealed approximately $500,000 of "One Time Payments <u>without</u> supporting justification or documentation" that Murphy and Lehr paid their prosecutors in the fiscal year immediately before the election. Thompson uncovered "special expenditure" accounts that held several hundred thousand dollars of unidentified cash.

39.  Comptroller Thompson did not report the missing money to law enforcement, allowed DA Donovan and his office to be self-policing, and watched Donovan's unregistered bank accounts balloon to almost two million dollars according to recent newspaper articles in December of 2009.

40.  District Attorney Daniel Donovan did not report the missing money to law enforcement either. Instead, he continues to pay his prosecutors based upon convictions and reportedly said in an October 2005 newspaper article, "we are going to get [your money] one way or another."

## THE INDIGENT PRO SE PLAINTIFFS

41.  Plaintiff Robert J. Fileccia, Esq. is and always has been an innocent United States Citizen. Robert J. Fileccia, Esq. has never been arrested or accused of a crime before the acts and transactions constituting the civil rights violations described herein.

42.  Plaintiff Robert J. Fileccia, Esq. was at the time of his unlawful seizure a resident of

Richmond County at 126 Egbert Avenue, Staten Island, New York 10310. Plaintiff Robert J. Fileccia, Esq. presently resides at 496 Willowbrook Road, Staten Island, New York 10314.

43.    Plaintiff Richard Fileccia is and always has been an innocent United States Citizen. Richard Fileccia has never been arrested or accused of a crime before the acts and transactions constituting the civil rights violations described herein.

44.    Plaintiff Richard Fileccia was at the time of his unlawful seizure a resident of Richmond County at 496 Willowbrook Road, Staten Island, New York 10314. Plaintiff Richard Fileccia presently resides at 496 Willowbrook Road, Staten Island, New York 10314.

45.    On March 18, 2002, the Plaintiffs were wrongfully indicted for Enterprise Corruption— The Car Indictment—based upon fraud, perjury, the suppression of exculpatory evidence, and other conduct undertaken in bad faith. Together, the Plaintiffs were falsely accused of three hundred nine (**309**) crimes without reasonable or probable cause or arguable probable cause.

46.    Investigations revealed that in or around December 2001, Assistant District Attorney David Frey (hereinafter referred to as "ADA Frey"), his paralegal Elizabeth Watts, and operatives within the United States Postal Service and Postal Inspection Service implemented a clandestine Mail Theft operation designed to manufacture fraudulent evidence against innocent United States citizens to falsely accuse them of crimes in order to steal their money and property. ADA Frey's mail theft ring was also surreptitiously used to cover up his criminal activity to avoid detection and apprehension. Indisputable documentary evidence including eye witness and ear witness testimony is set forth in detail and with specificity below.

47.    On March 20, 2002, District Attorney William Murphy filed a fraudulent and conspicuously unpublicized Article 13A civil forfeiture law suit against the Plaintiffs and their 85 year old mother Virginia Fileccia in <u>William Murphy v. Richard Fileccia, Robert Fileccia, et al.</u>, Index No. 8103/02.  DA Murphy's collateral objective was extortion, intending to forcibly steal the Fileccia Family's entire lifetime savings—one million one hundred forty thousand three hundred thirty nine dollars (**$1,140,339.60**) of cash and real estate.  On March 20, 2002, temporary restraining orders were issued without probable or reasonable cause that restrained <u>all</u> of the Plaintiffs' and their family's money.  The 'rubberstamped' TROs marked the beginning of years of poverty and shame for the Plaintiffs.

48.    In retribution for uncovering prosecutors' criminal activity in the 309-Count Car Indictment, on January 30, 2004, District Attorney Daniel Donovan wrongfully and maliciously indicted the Plaintiffs for tax evasion—The Tax Indictment—based upon fraud, perjury, the suppression of exculpatory evidence, and other conduct undertaken in bad faith.  The Plaintiffs were charged with four (4) additional tax related crimes without reasonable or probable cause or arguable probable cause.

49.    To inflict grave sorrow and distress on the Plaintiffs and their family, on July 26, 2004, District Attorney Daniel Donovan filed two more frivolous Article 13A civil forfeiture law suits against the Plaintiffs, <u>Donovan v. Robert Fileccia</u>, Index No. 12140/2004 and <u>Donovan v. Richard Fileccia</u>, Index No. 12141/2004 unlawfully seeking additional forfeiture in the amount of $46,129 and $102,474.28 respectively.

50.    On February 7 and February 27, 2007, all criminal charges pending against the Plaintiffs were dismissed in New York State Supreme Court in favor of the accused.  The dismissal

of all three hundred thirteen (**313**) criminal charges was <u>not</u> inconsistent with the Plaintiffs' innocence.

51.   On August 20, 2007, District Attorney Daniel Donovan voluntarily abandoned Civil Forfeiture Case Nos. 1, 2, and 3 with prejudice that originally requested One Million, Seven Hundred Two Thousand, and Four Hundred Ninety One dollars and fifty cents ($1,702,491.50).   Plaintiffs did <u>not</u> compromise with prosecutors who never received a cent of the unlawfully restrained assets.

52.   District Attorneys William Murphy and Daniel Donovan, the above captioned Defendants, and at least three Staten Island Supreme Court Judges (hereinafter referred to as "The Plumbers Team") knowingly and intentionally delayed the resolution of the three criminal cases and three civil forfeiture cases for more than five years—until the New York statute of limitations for felonies expired—to avoid detection, apprehension and punishment for their ongoing criminal activity.

53.   The Defendants ruthlessly and purposely devised the foregoing seizures and continued seizures to cause anguish—acute deeply felt inner pain—and despair to the Plaintiffs and their families.

54.   Plaintiff Robert J. Fileccia, Esq. is an attorney at law

   a)   admitted to practice in all Courts of the State of New York on May 20, 1992;

   b)   admitted to practice in the United States District Court for the Eastern District of New York on March 31, 1995;

   c)   admitted to practice in the United States District Court for the Southern District of New York on October 14, 2009;

   d)   admitted to practice in the United States Court of Appeals for the Second Circuit

on November 23, 2009;

    e) and who was Certified by the New York Court of Appeals for prospective admission into the United States Supreme Court on October 27, 2009.

55.    The Plaintiff Robert J. Fileccia, Esq. has never been suspended or disbarred from the practice of law and remains an attorney in good standing in all state and federal courts, notwithstanding prosecutors' malicious extrajudicial statements and rumors to the contrary.

56.    Notwithstanding Plaintiff Robert J. Fileccia, Esq.'s admission to the Eastern District and registration on the Electronic Case Filing (ECF) System on October 15, 2009 in preparation for the instant litigation, he is not a civil rights expert, has never before filed any civil action in any Federal Court, and is therefore no different than an ordinary pro se litigant eminently deserving of the special solicitude normally afforded pro se litigants by the Federal Courts: the well established rules that the complaint of a pro se litigant should be liberally construed in his favor, that his allegations must be taken as true in considering whether a claim is stated, and that his complaint not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

57.    On November 25, 2005, Richmond County Supreme Court Judge Leonard Rienzi certified the Plaintiff Robert J. Fileccia, Esq. to be a poor person [Tr. 11/29/05 at 5, Indictment 62/2002] after he was forced by prosecutors to file for divorce in order to obtain the promised services of an 18b legal aid lawyer, who was later bribed, threatened, or influenced by prosecutors to assist them in maintaining the malicious prosecution.

58.    The divorce Complaint dated November 25, 2006 warned the Supreme Court that

Plaintiff Robert Fileccia abandoned his wife and then 3-year old daughter and moved them to New Jersey **to protect them** from ADA Frey and the District Attorney's continuing criminal enterprise. See <u>Robert Fileccia v. Mary Christina Fileccia</u>, Index No. 051049.

59. On October 29, 2009, Albany County Supreme Court Judge Roger D. McDonough certified Plaintiff Richard Fileccia to be indigent and thereby entitled to poor person relief in a related pending Article 78 action. Richard Fileccia's claims of poverty, which are virtually identical to that of Robert J. Fileccia, Esq., went unopposed by the New York Attorney General.

60. As a result of the Defendants' malevolence, the Plaintiff Robert J. Fileccia, Esq. was unemployed and without any sources of income for more than six years—March 19, 2002 to September 19, 2008—causing indescribable financial and personal ruin. Mortgages and the Plaintiff's credit cards defaulted. Computer systems and office equipment failed, and sections of his mother's home where he has been living became uninhabitable because of his financial inability to repair or maintain them. Robert J. Fileccia, Esq. has no savings, no real or personal property, except a 9 year old Toyota automobile that he invites the defendants to appraise. He has not had medical insurance since his unlawful seizure on March 19, 2002. He lives separate and apart from his eight year old daughter Sofia Christina and her mother for the majority of the last 8 years. His marriage is irreparable. He remains in debt for hundreds of thousands of dollars to family and friends who continue to help support him. Although he has recently earned some income from September 19, 2008 to the present, the overwhelming majority of it was used to repay a small fraction of his debt to family and friends. Therefore, by any objective standard, he

remains a poor person until date, as a direct result of the Defendants cruel and inhuman punishment.

61.  Plaintiff Richard Fileccia has been unemployed since his unlawful seizure on March 19, 2002—causing indescribable financial and personal ruin.  He is in failing health and in need of surgery as a direct result of the foregoing malicious prosecutions.  He has no savings, real or personal property.  He has not had medical insurance since his unlawful seizure on March 19, 2002.  He remains in debt for hundreds of thousands of dollars to family and friends who continue to help support him.  He remains a poor person until date as a result of the Defendants cruel and inhuman punishment.

## THE DEFENDANTS

62.  At all times referred to herein, Defendant The City of New York ("The City") was and still is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

63.  At all relevant times to herein, the Police Department of the City of New York (hereinafter "NYPD") and Office of the New York City Comptroller (hereinafter "Comptroller's Office") was and still are agencies or instrumentalities of The City.  The NYPD and Comptroller's Office did not and does not have a legal identity separate and apart from Defendant The City.

64.  At all times referred to herein, Defendant The City, by its agents, servants and representatives, was responsible for the operation, maintenance and control of the NYPD, Comptroller's Office, and the Richmond County District Attorney's Office and the selection, training, supervision, evaluation and disciplining of NYPD and Comptroller's Office personnel and Assistant District Attorneys in the Richmond County District

Attorney's Office.

65.     At all times referred to herein, Defendant Daniel Donovan is the elected District Attorney of Richmond County for the City (hereinafter referred to as "DA Donovan") having taken office on or about January 1, 2004. DA Donovan is a citizen and resident of Staten Island, New York.

66.     At all times referred to herein, Defendant William Murphy is the former elected District Attorney of Richmond County for the City (hereinafter referred to as "DA Murphy") having left office on or about January 1, 2004. DA Murphy is a citizen and resident of New York, who resides at 169 Morrison Avenue, Staten Island, New York 10310.

67.     At all times referred to herein, Defendant David W. Lehr is the former Acting District Attorney of Richmond County for the City (hereinafter referred to as "DA Lehr") having left office on or about January 1, 2004. Upon information and belief, DA Lehr had assumed DA Murphy's responsibilities as a policymaker for The City when DA Murphy had taken ill in late 2003. DA Lehr is a citizen and resident of New York, who resides at 818 Davis Avenue, Staten Island, New York 10310. DA Lehr maintains an office at 1688 Victory Boulevard, Staten Island, New York 10314.

68.     At all times referred to herein, Defendants David Frey, Esq. (hereinafter "ADA Frey"), Karen Varriale, Esq. (hereinafter "ADA Varriale"), Mario Mattei, Esq. (hereinafter "ADA Mattei"), and various John Doe Assistant District Attorneys (hereinafter "ADA John Does"), were Assistant District Attorneys in the Office of the District Attorney, County of Richmond. Defendant Elizabeth Watts (hereinafter "Paralegal Watts"), was and still is a paralegal employed by the Richmond County District Attorney's Office. Upon information and belief, ADA Frey, ADA Varriale, ADA Mattei, Paralegal Watts,

and various ADA John/Jane Does are citizens and residents of New York.

69.    At all times referred to herein, Defendants DA Murphy, DA Donovan, and Acting DA Lehr, as District Attorneys for Richmond County, were the responsible policy makers for Defendant The City and the State of New York with respect to the management of the Richmond County District Attorney's Office.

70.    At all relevant times, Defendants DA Donovan, DA Murphy, Acting DA Lehr, ADA Frey, ADA Varriale, ADA Mattei, Paralegal Watts, and various ADA John/Jane Does, were acting within the scope of their employment as District Attorneys, Assistant District Attorneys, and paralegal for the State of New York.

71.    At all relevant times, Defendants DA Donovan, DA Murphy, Acting DA Lehr, ADA Frey, ADA Varriale, ADA Mattei, Paralegal Watts, and various ADA John/Jane Does, were acting under the color and pretense of the laws, statutes, ordinances, regulations, customs, and usages of the City and State of New York and under the authority of the Richmond County District Attorney's Office.

72.    At all times herein, Defendants DA Donovan, DA Murphy, Acting DA Lehr, ADA Frey, ADA Varriale, ADA Mattei, and various ADA John/Jane Does, acted on behalf of Defendant The City and the State of New York as municipal policymakers with the granted authority to (a) determine what exculpatory information, records and evidence should be gathered and disclosed to a suspect or his lawyer during an investigation (investigatory phase) and/or prosecution (judicial phase); (b) determine what evidence and testimony should be gathered and presented at grand jury proceedings, hearings and trial; (c) ensure that criminal investigations are conducted thoroughly and diligently and that reasonable inquiry is made before a suspect is accused of a crime; (d) ensure that

evidence is not fabricated, hidden, misplaced, ignored or destroyed in order to seize and falsely accuse an innocent United States citizen; (e) ensure that evidence is not falsified, fabricated, or withheld; (f) ensure that exculpatory evidence not be destroyed or otherwise made unavailable to a suspect or the accused; (g) ensure that witnesses do not commit perjury, give inaccurate or misleading testimony, or intentionally omit the truth when testifying; (h) ensure that extrajudicial statements not be made to the press before or during criminal proceedings that will foreseeably prejudice the accused; (i) ensure that criminal investigations and proceedings are handled ethically and in accordance with the laws and Constitution of the State of New York and the United States; (j) assert meritorious arguments that have a firm basis in fact and law; (k) conduct thorough and diligent investigations to protect the rights of the innocent; (l) ensure that evidence is properly registered, stored, preserved, maintained and produced in a timely manner to a criminal suspect, defendant and his/her attorneys; (m) refrain from committing federal or state criminal offenses or otherwise engaging in criminal activity to frame (set up) an innocent United States citizen in order to procure his wrongful seizure and or malicious continuing seizure; (n) refrain from aiding or abetting criminal activity or assisting a perpetrator from avoiding detection and or apprehension; (o) refrain from applying for search warrants without probable cause; (p) refrain from conducting warrantless searches and seizures; (q) refrain from endorsing and or ratifying an unconstitutional policy by receiving an unauthorized money bonus, career advancement, bribe, or other things of value in return for convicting or attempting to convict an innocent (or guilty) United States citizen; (r) refrain from bribing witnesses by offering them something of value in exchange for their perjured testimony; (s) ensure that a chain of custody is established

and maintained for all evidence during the pendency of the proceeding and for a reasonable time thereafter.

73.  At all times referred to herein, Defendant Steven Orlando (hereinafter "Steven Orlando") is a citizen and resident of New York, who resides at 10 Westbury Avenue, Staten Island, New York 10301, and was a willful participant in joint activity with the State or its agents.

74.  At all times referred to herein, Defendant Lori Ellen Orlando a/k/a Loriellen Keiser (hereinafter "Lori Orlando") is a citizen and resident of New York, who resides at 10 Westbury Avenue, Staten Island, New York 10301, and was a willful participant in joint activity with the State or its agents.

75.  At all times referred to herein, Defendant Data Comm Consulting Group Inc. (hereinafter "Data Comm") is a domestic corporation, duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 1276 Castleton Avenue, Staten Island, New York, 10310, and was a willful participant in joint activity with the State or its agents. Lori Ellen Orlando is the Chairman or Chief Executive Officer of Data Comm Consulting Group Inc.

76.  At all times referred to herein, Defendant 1276 Castleton Realty Co., LLC (hereinafter "1276 Castleton Realty Co.") is a domestic limited liability company, duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 1276 Castleton Avenue, Staten Island, New York 10310, and was a willful participant in joint activity with the State or its agents.   Steven Orlando is a managing member of 1276 Castleton Realty Co., LLC.

77.  At all times referred to herein, Defendant Commissioner Raymond Kelly (hereinafter

"Ray Kelly") was employed by the Defendant The City as a supervisor, policy maker and Commissioner for the NYPD.

78.    At all times referred to herein, Defendant Ray Kelly, as Commissioner of the NYPD, is the responsible policy maker for Defendant The City and the State of New York with respect to the management of the NYPD.

79.    At all times referred to herein, Defendant NYPD Detective Georgette Romagnano (Shield 2630) (hereinafter "Romagnano") was employed by the Defendant The City as a police officer assigned to the Staten Island Auto Squad and was a citizen and resident of New York.   Romagnano is now a citizen and resident of Florida, who resides at 2709 Stebbins Lane, The Villages, Florida 32162-4444.

80.    At all times referred to herein, Defendant NYPD Lieutenant Michael L. Paccione (hereinafter "Paccione") was employed by the Defendant The City as a police officer. Paccione is a citizen and resident of New York, who resides at 115 Macon Avenue, Staten Island, New York, 10312.

81.    At all times referred to herein, Defendant NYPD Sergeant Michael J. Botta (hereinafter "Botta") was employed by the Defendant The City as a police officer and was a citizen and resident of New York.   Botta is now a citizen and resident of Florida, who resides at 5024 Starblaze Drive, Greenacres, Florida 33463-5931.

82.    At all times referred to herein, Defendant NYPD Sergeant Gentile (hereinafter "Gentile") was employed by the Defendant The City as a police officer assigned to the NYPD College Point Auto Impound.

83.    At all times referred to herein, Defendant NYPD Sergeant Viola (hereinafter "Viola") was employed by the Defendant The City as a police officer assigned to the NYPD

College Point Auto Impound.

84.    At all times referred to herein, Defendant NYPD Sergeant Obokkobits (hereinafter "Obokkobits") was employed by the Defendant The City as a police officer assigned to the NYPD Property Clerk Warehouse.

85.    At all times referred to herein, Defendant NYPD Police Officer Silverio (hereinafter "Silverio") was employed by the Defendant The City as a police officer assigned to the NYPD Property Clerk Warehouse.

86.    At all times referred to herein, Defendant NYPD Sergeant Phillpotts (hereinafter "Phillpotts") was employed by the Defendant The City as a police officer assigned to the NYPD Property Clerk Warehouse.

87.    At all times referred to herein, Defendant NYPD Deputy Chief Jack J. Trabitz (hereinafter "Trabitz") was employed by the Defendant The City as a senior police officer and a supervisor, policymaker and Commanding Officer of the NYPD's Property Clerk's Division.

88.    At all times referred to herein, Defendant John/Jane Doe Police Officers (hereinafter "John/Jane Doe Police Officers") were employed by the Defendant The City as police officers assigned to the Staten Island Auto Squad and or Richmond County District Attorney's Squad.

89.    At all times referred to herein, Defendants Ray Kelly, Romagnano, Paccione, Botta, Gentile, Viola, and various John/Jane Doe Police Officers, individually and in their official capacities as employees of the City of New York, who are/were members of the NYPD, were employed by the Defendant The City as police officers and were involved in acts and/or omissions relating to the wrongful seizure and malicious continuing seizure

of the Plaintiffs, subsequent cover up of the fabricated indictment, ADA David Frey's mail theft ring, and/or registration, maintenance, storage, or control of evidence relating to Richmond County Indictment Nos. 62/2002 and 23/2004.

90.    At all times referred to herein, Defendants Ray Kelly, Romagnano, Paccione, Botta, Gentile, Viola, and various John/Jane Doe Police Officers, individually and in their official capacities as employees of the City of New York, who are/were members of the Police Department of the City of New York, acted within the scope of their employment as police officers for Defendant The City.

91.    At all times referred to herein, Defendants Ray Kelly, Romagnano, Paccione, Botta, Gentile, Viola, and various John/Jane Doe Police Officers, individually and in their official capacities as employees of the City of New York, who are/were members of the NYPD, were acting under the color and pretense of the law, statutes, ordinances, regulations, customs, and usages of the City of New York and under the authority of Defendant The City.

92.    At all times referred to herein, Defendants Ray Kelly, Romagnano, Paccione, Botta, Gentile, Viola, and various John/Jane Doe Police Officers, individually and in their official capacities as employees of The City who are/were members of the NYPD, were responsible for the unbiased investigation of crimes, the apprehension of proper suspects, the pursuit and study of physical evidence, and the providing of accurate and truthful information for prosecution to the Richmond County District Attorney's Office and other prosecutorial authorities; these Defendants were also responsible for other functions including giving truthful evidence; revealing exculpatory evidence; refraining from withholding or falsifying evidence during the plotting (investigatory) stage of a criminal

proceedings, from a grand jury or at trial; refraining from fabricating evidence; refraining from initiating or instigating an arrest or prosecution without probable or reasonable cause or arguable probable cause; refraining from applying for search warrants without probable cause; refraining from conducting warrantless searches and seizures; making further inquiry when reasonable in a criminal investigation (and not deviating from accepted practices in that regard); and preserving and properly storing critical evidence resulting from a criminal investigation; these Defendants were obliged to perform all these functions in accordance with the Constitutions and laws of the State of New York and the United States to ensure that innocent people are not arrested, prosecuted, convicted and incarcerated unjustly.

93.    At all times referred to herein, Defendant NYC Comptroller William Thompson (hereinafter "Thompson") was employed by the Defendant The City as a supervisor, policy maker and Comptroller.

94.    At all times referred to herein, Defendants Thompson, as Comptroller for The City, is the responsible policy maker for Defendant The City and the State of New York with respect to the management of the Comptroller's Office.

95.    At all times referred to herein, Defendant Michael Aaronson (hereinafter "Aaronson") was employed by the Defendant The City as a bureau chief for the Comptroller's Office.

96.    At all times referred to herein, Defendant Kevin Bryant (hereinafter "Bryant") was employed by the Defendant The City as a claims manager for the Comptroller's Office.

97.    At all times referred to herein, Defendant Robert Howe (hereinafter "Howe") was employed by the Defendant The City as a supervisor for the Comptroller's Office.

98.    At all times referred to herein, Defendant Ben Samuel (hereinafter "Samuel") was

employed by the Defendant The City as a claims manager for the Comptroller's Office.

99.    At all times referred to herein, Defendants Thompson, Aaronson, Bryant, Howe, and Samuel individually and in their official capacities as employees of the City of New York, who are/were members of the Comptroller's Office, were employed by the Defendant The City and were involved in acts and/or omissions relating to the wrongful seizure and malicious continuing seizure of the Plaintiffs under Richmond County Indictment No. 62/2002, subsequent cover up of the fabricated indictment, and Assistant District Attorney David Frey's mail theft ring

100.   At all times referred to herein, Defendants Thompson, Aaronson, Bryant, Howe, and Samuel individually and in their official capacities as employees of the City of New York, who are/were members of the Comptroller's Office, acted within the scope of their employment for Defendant The City.

101.   At all times referred to herein, Defendants Thompson, Aaronson, Bryant, Howe, and Samuel individually and in their official capacities as employees of the City of New York, who are/were members of the Comptroller's Office, were acting under the color and pretense of the law, statutes, ordinances, regulations, customs, and usages of the City of New York and under the authority of Defendant The City.

102.   At all times referred to herein, Defendant Thompson, individually and in his official capacity as employee of the City of New York, who is/was a member of the Comptroller's Office, was responsible for the unbiased investigation and audit of the financial and operating practices of the Richmond County District Attorney's Office, the unbiased investigation and reporting of one time "unjustified" payments of money—performance bonuses—to prosecutors based upon the number of convictions they obtain

(notwithstanding the guilt or innocence of the accused), reporting non-salary payments of money to Assistant District Attorneys, reporting employee theft to law enforcement authorities, and reporting unregistered bank accounts or other slush funds to the authorities including the source and use of the slush funds. This Defendant was also required to ensure that the Richmond County District Attorney's Office did not promulgate, ratify, and or enforce unconstitutional policies or customs by making one time "unjustified" payments—performance bonuses—to prosecutors based upon the number of convictions they obtain. This Defendant was obliged to perform all these functions in accordance with the Constitutions and laws of the State of New York and the United States to ensure that innocent people are not arrested, prosecuted, convicted and incarcerated unjustly.

103.    At all times referred to herein, Defendants Thompson, Aaronson, Bryant, Howe, and Samuel individually and in their official capacities as employees of the City of New York, who are/were members of the Comptroller's Office, were responsible for the timely and accurate assignment of claim numbers to all notices of claim that Plaintiffs' timely served on the Controller's Office. These Defendants were also responsible for other functions including refraining from misleading Plaintiffs as to their constitutional right of access to the Courts. These Defendants were obliged to perform all these functions in accordance with the Constitutions and laws of the State of New York and the United States.

104.    At all times referred to herein, Defendant George E. Filippides (hereinafter "Filippides") is a citizen and resident of New York, who resides at 16 Pilcher Street, Staten Island, New York 10314, and was a willful participant in joint activity with the State or its

agents.  At all times referred to herein, Defendant Filippides was a NYS Department of Motor Vehicles Vehicle Safety Inspector assigned to Region 6.  Defendant Filippides is being sued in the individual capacity.

105.   At all times referred to herein, Defendant Emerson L. Forde (hereinafter "Forde") is a citizen and resident of New York, who resides at 876 Blake Avenue, Brooklyn, New York 11207, and was a willful participant in joint activity with the State or its agents.  At all times referred to herein, Defendant Forde was a NYS Department of Motor Vehicles Vehicle Safety Inspector assigned to Region 6.   Defendant Forde is being sued in the individual capacity.

106.   At all times referred to herein, Defendant Bruce Evans Knoll (hereinafter "Knoll") is a citizen and resident of New York, who resides at 15 Lenox Avenue, Albany, New York 12203, and was a willful participant in joint activity with the State or its agents.  At all times referred to herein, Defendant Knoll was a lawyer employed by the NYS Department of Motor Vehicles. Defendant Knoll is being sued in the individual capacity.

107.   At all times referred to herein, Defendant Michael Sandler (hereinafter "Sandler") is believed to be a citizen and resident of New York, whose residence is presently unknown, and was a willful participant in joint activity with the State or its agents.  At all times referred to herein, Defendant Sandler was the Director of NYS DMV Vehicle Safety Division.  Defendant Sandler is being sued in the individual capacity.

108.   At all times referred to herein, Defendant Loraine K. Wilson a/k/a Loraine Kilgallen Wilson (hereinafter "Wilson") is a citizen and resident of New York, who resides at 295 Front Street, Schenectady, New York 12305, and was a willful participant in joint activity with the State or its agents.  At all times referred to herein, Defendant Wilson was a

Freedom of Information Law Officer for the NYS Department of Motor Vehicles. Defendant Wilson is being sued in the individual capacity.

109.    At all times referred to herein, Defendant Benjamin Brafman, Esq. (hereinafter "Brafman") is a citizen and resident of New York, who resides at 15 Waverly Place, Lawrence, New York 11559-2512, and was a willful participant in joint activity with the State or its agents.

110.    At all times referred to herein, Defendant Brafman & Ross P.C. (hereinafter "Brafman & Ross") is a domestic professional corporation duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 767 Third Avenue, 26th Floor, New York, New York 10017, and was a willful participant in joint activity with the State or its agents.  Benjamin J. Brafman is the Chairman or Chief Executive Officer of Brafman & Ross P.C.

111.    At all times referred to herein, Defendant Brafman and Associates, P.C. (hereinafter Brafman and Associates") is a domestic professional corporation duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 767 Third Avenue, 26th Floor, New York, New York 10017, and was a willful participant in joint activity with the State or its agents.  Benjamin J. Brafman is the Chairman or Chief Executive Officer of Brafman and Associates, P.C.

112.    At all times referred to herein, Defendant Mark M. Baker, Esq. (hereinafter "Baker") is a citizen and resident of New York, who resides at 2621 Palisade Avenue, #6B, Bronx, New York 10463-6120, and was a willful participant in joint activity with the State or its agents.

113.    At all times referred to herein, Defendant Alex Shulman, Esq. a/k/a Alex Hedy Shulman

(hereinafter "Shulman") is a citizen and resident of New York, who resides at 7 Dewhurst Street, Staten Island, New York 10314-5005, and was a willful participant in joint activity with the State or its agents.

114. At all times referred to herein, Defendant Alistair T. Abernethy (hereinafter "Alistair Abernethy") is a citizen and resident of New York, who resides at 64 Cambridge Avenue, Staten Island, New York 10314, and was a willful participant in joint activity with the State or its agents.

115. At all times referred to herein, Defendant Ann T. Abernethy a/k/a Ann T. Junior (hereinafter "Ann Abernethy") is a citizen and resident of New York, who resides at 64 Cambridge Avenue, Staten Island, New York 10314, and was a willful participant in joint activity with the State or its agents.

116. At all times referred to herein, Defendant Lydia A. Boyance (hereinafter "Boyance") is a citizen and resident of New York, who resides at 260 Livingston Avenue, Staten Island, New York, 10314-6932, and was a willful participant in joint activity with the State or its agents.

117. At all times referred to herein, Defendant Isabel Cornier a/k/a Isabel Lorenzo Cornier (hereinafter "Cornier") is a citizen and resident of New York, who resides at 519 Hanover Avenue, Staten Island, New York, 10304, and was a willful participant in joint activity with the State or its agents.

118. At all times referred to herein, Defendant Allyn J. Crawford (hereinafter "Crawford") is a citizen and resident of New York, who resides at 29 Kent Street, Staten Island, New York, 10306, and was a willful participant in joint activity with the State or its agents.

119. At all times referred to herein, Defendant Georgette A. Edkins (hereinafter "Edkins") was

a citizen and resident of New York and was a willful participant in joint activity with the State or its agents. Georgette Edkins now resides at 2 Hilltop Road, Milford, New Jersey 08848.

120. At all times referred to herein, Defendant Patricia H. Goebel (hereinafter "Patricia Goebel") was a citizen and resident of New York and was a willful participant in joint activity with the State or its agents. Patricia Goebel now resides at 11 Parkland Drive, Milford, New Jersey 08848.

121. At all times referred to herein, Defendant Frank W. Goebel (hereinafter "Frank Goebel") was a citizen and resident of New York and was a willful participant in joint activity with the State or its agents. Frank Goebel now resides at 11 Parkland Drive, Milford, New Jersey 08848.

122. At all times referred to herein, Defendant Edward A. Johnson (hereinafter "Edward Johnson") is a citizen and resident of New York, who resides at 780 Henderson Avenue, APT 3H, Staten Island, New York, 10310, and was a willful participant in joint activity with the State or its agents.

123. At all times referred to herein, Defendant Darlene Ann Johnson a/k/a Darlene Bullock (hereinafter "Darlene Johnson") is a citizen and resident of New York, who resides at 780 Henderson Avenue, APT 3H, Staten Island, New York, 10310, and was a willful participant in joint activity with the State or its agents.

124. At all times referred to herein, Defendant Julia A. King (hereinafter "King") is a citizen and resident of New York, who resides at 806 Elbe Avenue, Staten Island, New York, 10304, and was a willful participant in joint activity with the State or its agents.

125. At all times referred to herein, Defendant Frank Orlando a/k/a Frank Anthony Orlando

(hereinafter "Frank Orlando") is a citizen and resident of New York, who resides at 12 Naso Court, Staten Island, New York 10314, and was a willful participant in joint activity with the State or its agents.

126. At all times referred to herein, Defendant Haide Rosado a/k/a Aide Rosado (hereinafter "Rosado") is a citizen and resident of New York, who resides at 497 Delafield Avenue, Staten Island, New York 10310, and was a willful participant in joint activity with the State or its agents.

127. At all times referred to herein, Defendant George W. Stapleton (hereinafter "George Stapleton") is a citizen and resident of New York, who resides at 158 Cannon Avenue, Staten Island, New York 10314, and was a willful participant in joint activity with the State or its agents.

128. At all times referred to herein, Defendant Frank M. Stapleton (hereinafter "Frank Stapleton") is a citizen and resident of New York, who resides at 158 Cannon Avenue, Staten Island, New York 10314, and was a willful participant in joint activity with the State or its agents.

129. At all times referred to herein, Defendant Eileen Tritto a/k/a Eileen Junior (hereinafter "Tritto") is a citizen and resident of New York, who resides at 1949 New Hyde Park Road, New Hyde Park, New York 11040-2028, and was a willful participant in joint activity with the State or its agents.

130. At all times referred to herein, Defendant Sidra M. Vazquez a/k/a Sidra M. Cardieri (hereinafter "Vazquez") is a citizen and resident of New York, who resides at 23 Woodcrest Road, Staten Island, New York 10303-1730, and was a willful participant in joint activity with the State or its agents.

131.   At all times referred to herein, Defendant Diane E. Vines a/k/a Diane E. Monohan (hereinafter "Diane Vines") is a citizen and resident of New York, who resides at 394 Davis Avenue, APT 1, Staten Island, New York 10310, and was a willful participant in joint activity with the State or its agents.

132.   At all times referred to herein, Defendant Walter Vines (hereinafter "Walter Vines") is a citizen and resident of New York, who resides at 129 Beecher Road, Lanesville, New York 12450-1002, and was a willful participant in joint activity with the State or its agents.

133.   At all times referred to herein, Defendant John G. Hall (hereinafter "Hall") is a citizen and resident of New Jersey, who resides at 16 Mulberry Lane, Colts Neck, New Jersey 07722, and was a willful participant in joint activity with the State or its agents. Defendant Hall is senior partner of The Law Firm of Hall & Hall in Staten Island, New York.

134.   At all times referred to herein, Defendant The Law Firm of Hall & Hall LLP (hereinafter "Hall & Hall LLP") is a domestic registered limited liability partnership, duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 57 Beach Street, Staten Island, NY 10304, and was a willful participant in joint activity with the State or its agents.

135.   At all times referred to herein, Defendant "SI Bank & Trust" is a division of "Sovereign Bank." "Sovereign Bancorp, Inc." was/is the parent company of Sovereign Bank. Sovereign Bancorp, Inc. and Sovereign Bank are now subsidiaries of "Banco Santander." New York Secretary of State filings indicate that the Name History of SI Bank & Trust includes "SI Bank & Trust Foundation" as of April 30, 2001; and "The Staten Island

Foundation" as of December 19, 2006. All of the foregoing banks, subsidiaries, entities, corporations, and fictitious names do business in New York and are being made Defendants herein. All of the foregoing banks, subsidiaries, entities, corporations, and fictitious names were willful participants in joint activity with the State or its agents.

136.    At all times referred to herein, Defendant Lorraine M. Stergious a/k/a Lorraine M. Kenny (hereinafter "Stergious") is a citizen and resident of New York, who resides at 79 Malone Avenue, Staten Island, New York 10306, and was a willful participant in joint activity with the State or its agents.

137.    At all times referred to herein, Defendant Thomas P. Burns (hereinafter "Burns") is a citizen and resident of New York, who resides at 58 Anderson Avenue, Staten Island, New York 10302, and was a willful participant in joint activity with the State or its agents.

138.    At all times referred to herein, Defendant Nino Giovanni Cutillo (hereinafter "Cutillo") is a citizen and resident of New York, who resides at 104 Clarke Avenue, Staten Island, New York 10306, and was a willful participant in joint activity with the State or its agents.

139.    At all times referred to herein, Defendant Steven J. Demizio Sr. (hereinafter "Demizio") is a citizen and resident of New York, who resides at 42 Fairbanks Avenue, Staten Island, New York 10306, and was a willful participant in joint activity with the State or its agents.

140.    At all times referred to herein, Defendant Robert A. Girod, Jr. (hereinafter "Girod") is a citizen and resident of New Jersey, who resides at 359 Dukes Road, Colonia, New Jersey 07067, and was a willful participant in joint activity with the State or its agents. Girod is

employed by Pioneer Transportation Corporation in Staten Island, New York.

141.  At all times referred to herein, Defendant John Loiacono (hereinafter "Loiacono") was a citizen and resident of New York and was a willful participant in joint activity with the State or its agents.  Loiacono now resides at 2210 Cedar Village Boulevard, East Brunswick, New Jersey 08816.  Loiacono is employed at Etna Motors in Staten Island, New York.

142.  At all times referred to herein, Defendant Paul Nicholson (hereinafter "Nicholson") is a citizen and resident of New Jersey, who resides at 619 Cosy Lane, Jackson, New Jersey 08527, and was a willful participant in joint activity with the State or its agents.

143.  At all times referred to herein, Defendant Walter E. Parks (hereinafter "Parks") is a citizen and resident of New York, who resides at 175 S Goff Avenue, Staten Island, New York 10305, and was a willful participant in joint activity with the State or its agents.

144.  At all times referred to herein, Defendant Eric T. Paulsen (hereinafter "Paulsen") is a citizen and resident of New York, who resides at 73 Jackson Avenue, Staten Island, New York 10305, and was a willful participant in joint activity with the State or its agents.

145.  At all times referred to herein, Defendant Michael A. Przybyszewski (hereinafter "Przybyszewski") is a citizen and resident of New York, who resides at 51 Parish Avenue, Staten Island, New York 10314, and was a willful participant in joint activity with the State or its agents.

146.  At all times referred to herein, Defendant Steven M. Reiss (hereinafter "Reiss") is a citizen and resident of New York, who resides at 479 Sharrotts Road, Staten Island, New York 10309, and was a willful participant in joint activity with the State or its agents.

147.  At all times referred to herein, Defendant Nicholas J. Williams (hereinafter "Williams")

is a citizen and resident of New Jersey, who resides at 188 Florence Avenue, Colonia, New Jersey 07067, and was a willful participant in joint activity with the State or its agents. Williams is employed by Pioneer Transportation Corporation in Staten Island, New York.

## NOTICE OF CLAIM & ARTICLE 50(h) HEARING

### COMPTROLLER THOMPSON'S VIOLATION OF THE PLAINTIFFS' RIGHT OF ACCESS TO THE COURTS

148. Plaintiffs timely served written Notice of Claim upon The City on May 29, 2007. More than thirty (30) days have passed since the service and filing of said Notice and the claim has not been settled or otherwise resolved.

149. The City has never requested an Article 50 (h) hearing pursuant to the New York General Municipal Law.

150. Instead, Defendants Thompson, Aaronson, Bryant, Howe, and Samuel failed to issue certain claim numbers to the Plaintiffs (and their family) for more than 11 months attempting to run the clock on the Plaintiffs' time to file a claim in State Supreme Court, in violation of the Plaintiffs' constitutional right of access to courts. When Thompson's delay in issuing claim numbers approached the statute of limitations, Plaintiffs served him with additional written demands for claim numbers.

151. In a letter dated May 7, 2008, Plaintiff Robert J. Fileccia Esq. warned Thompson that,

> "Richmond County Assistant District Attorney David Frey stole United States Mail addressed to the claimants for approximately the last five (5) years in violation of 18 USCS §1708: Theft or receipt of stolen mail matter generally, and 18 USCS §1341: Frauds and swindles."

152. In a letter dated May 8, 2008, Plaintiff Robert J. Fileccia Esq. admonished Thompson,

> "[Y]our officers are hiding seven notices of claim in connection with a break-in and attempted theft of a million dollars ..." and "claim examiner

> Ben Samuel continues to provide Staten Island District Attorney Daniel Donovan with political cover for the crimes he and his assistants committed."

153.  In response, Defendants Thompson, Aaronson, Bryant, Howe, and Samuel

    a) issued false claim numbers—ghost numbers—to the Plaintiff, and

    b) corruptly disallowed one of the claims alleging it was *untimely* knowing same to be untrue.

They did this to obstruct the Plaintiffs from filing meritorious claims in State Supreme Court in violation of the Plaintiffs' constitutional right of access to courts, fabricate a fraudulent defense for The City's lawyers, and assist ADA Frey to avoid detection and apprehension for committing numerous federal mail crimes more fully explained below.

154.  In a letter dated May 10, 2008, Aaronson admitted to the issuance of ghost claim numbers and apologized to the Plaintiffs for the confusion associated with the Comptroller's gross negligence or deliberate misconduct,

> "Please accept our apologies for the confusion related to the filing of your claims ... I can honestly tell you that I can't remember the last time we had problems such as you've encountered."

155.  In a letter dated May 27, 2008, immediately *after* the expiration of the Plaintiffs' time to file a claim in State Supreme Court, Thompson's lawyer, Allen Fitzer, Esq., issued new claim numbers for the Plaintiffs and their family.

156.  In a letter dated May 27, 2008, immediately *after* the expiration of the Plaintiffs' time to file a claim in State Supreme Court, Samuel also admitted that he wrongfully disallowed the Plaintiffs' claim and that his malfeasance was under investigation,

> "[P]lease disregard the disallowance notice that was sent to you on April 1, 2008. The disallowance has been rescinded and the status of your claim is under investigation."

157.  Based upon the foregoing, Plaintiffs have satisfied all conditions precedent for the filing

of the within action.

### THE PLAINTIFFS' SEIZURES

158.   On March 18, 2002, the Plaintiffs were wrongfully indicted for Enterprise Corruption in Staten Island, New York, based upon fraud, perjury, the suppression of exculpatory evidence, and other conduct undertaken in bad faith.  The Indictment, <u>People v. Richard and Robert Fileccia</u>, No. 62/2002, was filed on March 19, 2002 and unsealed on March 20, 2002.

159.   On the evening of March 19, 2002, at approximately 8pm, Plaintiff Robert J. Fileccia, Esq. was arrested and placed in handcuffs in The Law Firm of Hall & Hall, 57 Beach Street in Staten Island, where he was employed as a real estate lawyer.  No less than fifteen (15) armed plain clothes detectives and Assistant District Attorneys laid in wait— in the dark—as Robert J. Fileccia, Esq. returned from a closing to his second floor office.

160.   NYPD detectives ordered Plaintiff Robert J. Fileccia, Esq. to surrender his 'weapons.' He gave them a pen and pencil that he used at the closing.

161.   Detectives ordered Plaintiff Robert J. Fileccia, Esq. to surrender his 'cash' for vouchering.  Robert surrendered exactly ten dollars ($10) which was immediately returned to him.

162.   When exiting the law firm, the Plaintiff Robert J. Fileccia, Esq.'s hands were cuffed behind his back for transport to a holding cell in the Richmond County District Attorney's Office.  There he waited for hours while numerous detectives raided his one bedroom apartment at 126 Egbert Avenue in Staten Island where his young wife and then 6-month old daughter Sofia Cristina lived.



163.  Later that evening, Plaintiff Robert J. Fileccia, Esq. was moved to the general population at the 120 Police Precinct where he was jailed until his arraignment the following afternoon. While in the basement of the 120th Police Precinct, Robert J. Fileccia, Esq. was chained at the ankle to a "chain gang," a collection of drug and narcotic suspects and accused weapon dealers. He shared a cell with a mentally unstable man who was accused of stabbing and being stabbed by his girlfriend, who showed Plaintiff the knife holes in his jacket to corroborate his story.

164.  On the evening of March 19, 2002, at approximately 9pm, Plaintiff Richard Fileccia was arrested at his home at 496 Willowbrook Road in Staten Island and taken directly to the 120th Police Precinct basement holding cell, where he spent the evening until his arraignment the following afternoon.

165.  The Plaintiffs were arraigned on March 20, 2002 before State Supreme Court Justice Anthony Giacobbe.

166.  ADA Frey falsely accused the Plaintiffs of "numerous burglary charges" and threatened

them with "30 years" in prison because of their "twisted" behavior. [Tr. 3/20/02 at 5.] The 309-Count Car Indictment does <u>not</u> mention a word about "burglary."

167. Based upon ADA Frey's deliberate misrepresentations and his fabricated 309-Count indictment, Judge Giacobbe set bail at one hundred thousand dollars ($100,000), cash or bond, for each Plaintiff.

168. The Plaintiffs remained handcuffed throughout the arraignment and jailed in a Supreme Court basement holding cell until 4pm on March 20, 2002, when their family posted a two hundred thousand dollars ($200,000) bail bond for their release.

169. The Plaintiffs were:

   a) Ordered to personally appear every week at the bail bondsman's office to sign the weekly attendance sheet;

   b) unable to leave the jurisdiction without district attorney authorization and leave of Court; and

   c) required to timely appear each and every time the case appeared on the Supreme Court's motion, status and trial calendars.

170. The Plaintiffs' deprivation of liberty—the seizure—was effected pursuant to legal process.

171. The Plaintiffs' wrongful seizure subjected them to significant restrictions of their constitutional right to travel freely.

## THE 'EVIL TWINS' PRESS RELEASE
### DAs Murphy, Lehr, and Donovan Make False Public Statements

172. Beginning on March 20, 2002, Murphy and Lehr made numerous false public statements to local and national media concerning their 'investigation', indictment and arrest of the plaintiffs that were published to millions of people. The DAs' press releases were

designed to inflame the Staten Island community, prejudice public opinion and corrupt the jury pool.

173.    On March 20, 2002, Murphy and Lehr sent the Daily News a press release entitled, 'EVIL TWINS' INDICTED FOR ENTERPRISE CORRUPTION' (emphasis in the original) to launch David Lehr's campaign for Staten Island District Attorney. Murphy and Lehr falsely claimed, among other things,

> "The 6-month joint investigation, dubbed "Operation Shame on You", uncovered a 10-year-old criminal enterprise which victimized more than 100 people. The Fileccia brothers set up a service station in West Brighton at the corner of Clove Road and Castleton Avenue, under the various names of "CPA Motor", "Members Only", "On The Job", and "VIP Motor". They are accused of stealing customers' cars, charging for repairs not done, parts not replaced and repairs done incorrectly.

> "When something seems too good to be true, there is usually a reason." said District Attorney William L. Murphy. "The Fileccias lured people into their lair for almost 10 years with flashy advertisements, and by dangling promises of cheap repairs and incredible warranties."

> Some of the victims still have not been able to get their cars back, six years after driving into the auto shop. Those who did retrieve their cars, but refused to pay for shoddy repair work, were sued by Robert Fillecia.
> In addition to their car customers, the Fileccia brothers are also accused of victimizing their shop's landlord. The Fileccia brothers sold their building during the summer of 2000, but stayed there until February of 2002. When they vacated the premises, they left behind a car-lift, and owed money in back-rent. The new owner refused to give them access to the property in order to retrieve the lift, until he received the past due rent. They sued him as well, claiming, among other things, that the new owner had damaged one of "their" cars-a car, that had, in fact, belonged to one of their victims.

> The Fileccia brothers will be arraigned in state Supreme Court today. Search warrants had been issued and executed for their homes and work places. At least four abandoned cars were towed from behind their old shop, and the nearby streets. The police are still seeking to identify the owners of those cars.

174.    Murphy and Lehr told Channel 11 WPIX TV news station the following false statements that aired on the 10 o'clock prime time evening news:

> "Robert and Richard Fileccia were in court today for stealing cars and

> cash from service station customers. No repairs were made and parts were not replaced. Some customers' cars were held for 6 years and are still waiting to get their car. They promised cheap repairs and warranties which were too good to be true."

175.   The Daily New ran a lengthy article entitled, "AUTO FIX SCAM CRACKED BY DA."

[Emphasis in the original.] Lehr was quoted falsely accusing the Plaintiffs:

> "They would make up things that weren't wrong or make shoddy repairs, and when the customer refused to pay, they'd keep the car in lieu of payment of the bill. Robert Fileccia would then take the customers and wear them down. We don't even know who owns some of these cars."

176.   On March 21, 2002, the Staten Island Advance ran a front-page article that destroyed any possibility of the Plaintiffs ever receiving a fair trial.   The article was titled, "TWINS RAN SCAM AUTO REPAIR SHOP – DA says attorney and accountant used West Brighton shop to steal from their customers." [Emphasis in the original.]   Lehr and Murphy were quoted falsely stating, among other things, that:

> "Robert Fileccia violated his oath as an attorney by deceiving people, courts, or municipalities like the Department of Motor Vehicles ... The Fileccia lured People into their lair for almost 10 years with flashy advertisements, and by dangling promises of cheap repairs and incredible warranties."

177.   A long-time Staten Island criminal defense lawyer, however, who was familiar with Murphy's corrupt office, publically admonished the accusations to be, **"the district attorney's greatest misadventure to date. This smells like a mackerel in a paper bag on a hot summer day."**

178.   On May 4, 2004, after DA Donovan won the election, a full-page Staten Island Advance newspaper article became talk of the town: "Judge dismisses most charges against twin brother. Total of 160 counts tossed, but Fileccias still face 35 counts in alleged scam to bilk auto repair customers." DA Donovan, not six months at his post, nonetheless tried to

deflect the Supreme Court's ruling and falsely proclaimed, "We are perfectly satisfied, to prosecute the defendants on the remaining counts of the indictment. We believe the core of the case, alleging tax evasion and defrauding their clients, remain strong and intact."

179.    DA Donovan's statement was materially false because the Car Indictment didn't mention a word about tax evasion.

180.    DAs Murphy, Lehr, and Donovan leaked information and false statements to the press to maliciously and in bad faith prejudice public opinion against the Plaintiffs and deprive them of their constitutional right to an unbiased jury and fair trial.

## THE FABRICATION OF FALSE EVIDENCE DURING THE INVESTIGATORY STAGE OF THE CRIMINAL PROCEEDINGS

181.    Investigations reveal that ADA Frey began to fabricate the 309-Count Car Indictment more than a year *before* presentation of false evidence to a grand jury.

182.    A prosecution witness informed investigators that ADA Frey bribed witnesses with straight kickbacks in the form of a class action law suit against the Plaintiffs.

### "RUNNERS"

183.    ADA Frey deployed "runners" to **recruit** witnesses into his criminal plan to steal the Plaintiffs' money and property.  He handpicked NYPD Detective Georgette Romagnano, NYPD Lieutenant Michael Paccione, and DMV Inspector George Filippides to be his "runners" in the black operation who scoured DMV Complaint Reports and Small Claims Court records as far back as 15 years searching for former CPA customers who were either very poor and needed money or were just willing to commit perjury for profit.

184.    ADA Frey and the "runners" would then visit the former CPA customers and recruit them by offering various bribes including:

    a)  Straight kickbacks in the form of a class action law suit; or

    b)  Restitution in the form of a promise to get back the money they previously lost to the repair shop in Small Claims Court.

185.   If the witness didn't go for the bribe, ADA Frey and his runners would inflame the witness with false propaganda about the Plaintiffs.

186.   One prosecution witness told investigators that ADA Frey told him that the Plaintiffs "had been fu*king up for ten years and they had been screwing people off ... Frey basically said they were crooks."

187.   Another prosecution witness told investigators that ADA Frey found her through Small Claims Court records, called her on the telephone, and met her at her job.  She said ADA Frey "asked me if I would be interested and I said, "YES."

188.   A third witness, who could not be bribed, sent a letter directly to State Supreme Court Leonard Rienzi that warned the Court that ADA Frey was framing the Plaintiffs:

> "David Frey desperately tried to recruit me into his case by discussing the crimes the Fileccias allegedly committed. ... He told me that Richard Filecccia held people's cars for years, refused to return their cars to them, and ripped them off ... He told me that he was surprised of the low price [he charged me] because Richard was charging people thousands of dollars for brake repairs and was ripping them off ... David Frey grew frustrated and asked me if I was related to the Fileccias. Apparently he wasn't receiving the answers he was looking for.  I again repeated that I was not related to the Fileccias and have been Richard's customer for years.  He replied, "that's OK, Richard screws his family as well. He rips them off too ... I wish to repeat that my car was not stolen and am very interested to learn what 'stolen' cars David Frey is referring to?  Based upon his reprehensible conduct, I wouldn't be surprised to learn that there are no stolen cars!"

189.   Investigations reveal that in March 2001, ADA Frey also set up a surveillance post and a grab team within blocks of Richard Fileccia's auto repair shop in Staten Island. The grab team—led by Lieutenant Paccione—surreptitiously "grabbed" CPA customers as they entered or exited the repair shop and solicited them to join the DA's black operation.

190.   Investigations reveal that Lieutenant Paccione also bribed witnesses with a class action law suit against the Plaintiffs.

191.   On April 30, 2004, State Supreme Court Judge Leonard Rienzi issued a decision that dismissed all but 34 of the fabricated Car Indictment charges and confirmed that ADA Frey **recruited** all of his prosecution witnesses and that no one made any complaints to law enforcement:

> **"The District Attorney called the dissatisfied customers of CPA to testify in the grand jury** ... The District Attorney then introduced court files from Civil Court (where the dissatisfied customers had either sued CPA or been sued by CPA) and letters written to DMV by Robert Fileccias, as attorney for CPA. The District Attorney then obtained an indictment, based essentially on the testimony of the dissatisfied customers (some of whom prevailed in previous litigation, some of whom did not), the Civil Court files and the DMV letters." [J. Rienzi, 4/30/04 decision, at 3.]

192.   Investigations reveal that ADA Frey recruited Isabel Cornier, Julia King, Lydia Boyance, Ernest Moerlins, Haide Rosado, and Steven Demizio, during the investigatory (plotting) stage of the proceedings. ADA Frey tried to recruit Eric Emanuel, Ralph Dima, and many others. Detective Romagnano recruited Claire Fama, John Fama, George Stapleton, Frank Stapleton, Patricia Goebel, Frank Goebel, Georgette Edkins, and many others during the investigatory (plotting) stage of the proceedings. NYPD Lieutenant Michael Paccione recruited Sidra Vazquez, Darlene Johnson, Edward Johnson, Theodore Schneider, Judy Schneider, Paul Nicholson, Nino Cutillo, DMV Inspector Emerson Forde, and Alan Bima during the investigatory (plotting) stage of the proceedings. Lieutenant Paccione tried to recruit Anthony Treglia, George Marcinek, and many others. NYC Civil Court Judge Philip Straniere recruited William Archer.

193.   On August 1, 2005, Inspector George Filippides testified under oath—after being sued by Plaintiff Robert J. Fileccia, Esq. to compel his testimony—and admitted that ADA Frey

held a secret round table meeting in his office long *before* any grand jury was convened.

194.    The record evidence indicates that ADA Frey told his runners and at least 15 co-conspirators to attend a secret meeting to fabricate false evidence including fraudulent DMV Complaint Reports and Investigation Reports that Frey later used to manufacture the Plaintiffs' Car Indictment.

| | |
|---|---|
| Q: | Why were you at this meeting? Who invited you? |
| Filippides: | Umm, I believe it was the DA. |
| Q: | David Frey? |
| Filippides: | I believe so. ... |
| Q: | And was Detective Romagnano there as well? |
| Filippides: | Yes, I believe so. ... |
| Q: | Do you know if Mike Paccione was present at this meeting also? |
| Filippides: | Yes, I believe so. ... |
| Q: | Alright. Frey was running the meeting, correct? |
| Filippides: | The meeting was in his office. |
| Q: | No, but he called the meeting? |
| Filippides: | I believe he did. ... |
| Q: | Okay, Frey was conducting the meeting, correct? It was his meeting. |
| Filippides: | It was his meeting. I was notified to be there. I showed up like everybody else. |
| Q: | Okay. And it was in Frey's office? |
| Filippides: | Correct. ... |
| Q: | It was in a conference room? |
| Filippides: | Correct. ... I recall having a meeting and there was a huge table with a bunch of chairs.  [Tr. 8/1/05 at 92-110.] |

195.    **However, when asked specifics about ADA Frey's secret meeting, DMV Inspector George Filippides testified that he didn't remember more than one hundred (100) times in less than six hours.**

46

## ADA FREY FABRICATES FALSE EVIDENCE AND CHARGES

196.     Due to the volume of evidence uncovered against ADA Frey, the following is presented in seriatim.

197.     ADA Frey's viscous propensity to harm innocent United States Citizens is unmistakable and indictable. On August 6, 2001, Plaintiff Robert J. Fileccia sent a letter to DMV Inspector George Filippides attempting to postpone an automobile inspection because his wife and unborn daughter's lives were in danger. The letter, Grand Jury Exhibit No. 2 (GX2), said in pertinent part,

> "Please be advised that my wife was admitted to St. Vincent's Hospital located in Staten Island, only hours ago. Being seven months pregnant, both she and her baby are in jeopardy. Therefore ... [please] reschedule our appointment no earlier than the beginning of next week."

198.     According to Grand Jury Exhibits 1, 2, and 3, ADA Frey's bill of particulars, and Filippides' sworn testimony; ADA Frey conspired and acted in concert with Filippides to fabricate DMV investigation report No. 6RS175500 to initiate and procure the Plaintiffs' wrongful seizure without probable cause. Filippides then took the fabricated DMV investigation report and later testified falsely before the grand jury that the August 6, 2001 letter was fraudulent and the Plaintiffs were trying to steal a 1986 Corvette.

199.     ADA Frey and Filippides made no attempt to investigate the truth or falsity of the August 6, 2001 letter. On August 8, 2005, Filippides testified under oath that he did not call St. Vincent's hospital to see if Mary Fileccia was a patient and made no inquiries into the veracity of the August 6, 2001 letter.

200.     The following St. Vincent's Hospital admission invoice clearly indicates Robert Fileccia's estranged wife Mary Fileccia was admitted on August 6, 2001.

## Remittance Advice

Vendor Name  SISTERS OF CHARITY MEDICA,
Vendor ID#  N031828                          Check # Y21149035              Page        1
                                                                          08-25-01

Member Name  FILECCIA, MARY                Provider Name  ST VINCENTS MEDICAL CENTER
Member ID    181804201                     Provider ID    N03182
Patient Ref# 49386030-1                    Claim          1229153092

| CPT Code | Description of Service | Date of Service | Qty | Billed Amt | Maximum Amt | Withhold Amt | Adj Code | Ded. Amt | Copay Amt | COB Amt | Payment Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|
| INGYN | IN HOSP-GYNECOLOGY | 08-06-01 | 1 | 2593.00 | 846.00 | 0.00 | A37 | 0.00 | 0.00 | 0.00 | 846.00 |
| Totals for Claim 1229153092 | | | | 2593.00 | 846.00 | 0.00 | | 0.00 | 0.00 | 0.00 | 846.00 |

**Total**                         2593.00  846.00   0.00        0.00   0.00   0.00   846.00

| | |
|---|---|
| Total Paid: | 846.00 |
| Check Date: | 08-25-01 |
| Paid to: | SISTERS OF CHARITY MEDICA |
| Check Number: | Y21149035 |
| Control Number: | 065508362 |

201.   Plaintiff Robert Fileccia's daughter Sofia Christina was born 2 months premature weighing less than 3 pounds.



202. Notwithstanding the foregoing exculpatory evidence, ADA Frey and Filippides caused the Plaintiffs to be charged with twenty one (21) felonies based upon the truthful August 6, 2001 letter (GX2) and two other letters denominated GX 1 and GX 3. The following seven felonies pertain to the August 6, 2001 letter.

1. Count 55: FALSIFYING BUSINESS RECORDS IN THE SECOND DEGREE (P.L.§ 175.05[1]), committed as follows: The said defendants, in the Borough of Staten Island, County of Richmond, City and State of New York, on or about 8/6/01, with intent to defraud, made or caused to be made a false entry in the business records of an enterprise, to wit: the NYS Department of Motor Vehicles.

2. Count 61: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE (P.L.§ 175.10), committed as follows: The said defendants, in the Borough of Staten Island, County of Richmond, City and State of New York, on or about 8/6/01, with intent to defraud, made or caused to be made a false entry in the business records of an enterprise, to wit: the NYS Department of Motor Vehicles, and did so with the intent to commit another crime and to aid and conceal the commission thereof, to wit: Grand Larceny in the Third Degree. [Alleged theft of Stapleton's Corvette referred to in Count 2]

3. Count 62: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE (P.L.§ 175.10), committed as follows: The said defendants, in the Borough of Staten Island, County of Richmond, City and State of New York, on or about 8/6/01, with intent to defraud, made or caused to be made a false entry in the business records of an enterprise, to wit: the NYS Department of Motor Vehicles, and did so with the intent to commit another crime and to aid and conceal the commission thereof, to wit: Grand Larceny in the Fourth Degree. [Alleged theft of Stapleton's Corvette referred to in Count 12]

4. Count 63: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE (P.L.§ 175.10), committed as follows: The said defendants, in the Borough of Staten Island, County of Richmond, City and State of New York, on or about 8/6/01, with intent to defraud, made or caused to be made a false entry in the business records of an enterprise, to wit: the NYS Department of Motor Vehicles, and did so with the intent to commit another crime and to aid and conceal the commission thereof, to wit: Criminal Possession of Stolen Property Fourth Degree. [Alleged Criminal Possession of Stapleton's Corvette referred to in Count 85]

5. Count 64: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE (P.L.§ 175.10), committed as follows: The said defendants, in the Borough of Staten Island, County of Richmond, City and State of New York, on or about 8/6/01, with intent to defraud, made or caused to be made a false entry in the business records of an enterprise, to wit: the NYS Department of Motor Vehicles, and did so with the intent to commit another crime and to aid and conceal the commission thereof, to wit: Criminal Possession of Stolen Property in the Third Degree.

6. **Count 71: TAMPERING WITH PUBLIC RECORDS IN THE SECOND DEGREE** (P.L.§ 175.20), committed as follows: The said defendants, in the Borough of Staten Island, County of Richmond, City and State of New York, on or about **8/6/01**, knowing that they did not have the authority of anyone entitled to grant it, knowingly removed, mutilated, destroyed, concealed, made a false entry in and falsely entered a record and other written instrument filed with, deposited in, and otherwise constituting a record of a public office or public servant.

7. **Count 72: TAMPERING WITH PUBLIC RECORDS IN THE FIRST DEGREE** (P.L.§ 175.25), committed as follows: The said defendants, in the Borough of Staten Island, County of Richmond, City and State of New York, on or about **8/6/01**, knowing that they did not have the authority of anyone entitled to grant it, and with the intent to defraud, knowingly removed, mutilated, destroyed, concealed, made a false entry in and falsely entered a record and other written instrument filed with, deposited in, and otherwise constituting a record of a public office or public servant.

203. Judge Leonard Rienzi April 30, 2004 decision recognized the depth of ADA Frey's depravity and said, "Thus an attorney writing three letters to the Department of Motor Vehicles on behalf of his client, seeking to adjourn an inspection finds himself indicted for twenty-one felonies ... Writing a letter to the NYS Department of Motor Vehicles concerning the rescheduling of an appointment, whether or not it contains any false information, does not constitute Tampering with Public Records." [Tr. 4/30/04 at 18, 19.]

204. Grand Jury Exhibits indicate that Inspector Filippides was the first witness to testify in the grand jury evidencing his uncontrollable hatred and desire to get even with attorney Robert Fileccia for initiating his co-worker Bernard "Whitey" Napoli's arrest and conviction for bribery in 1999.

205. On January 6, 2006, investigators secured prosecution witness Claire Fama's sworn testimony that reveals incontrovertible evidence that ADA Frey fabricated seven (7) more felonies against the Plaintiffs without probable or reasonable cause:

"My son and I told ADA David Frey and Detective Romagnano that we left my 1971 Pontiac Ventura at CPA for six years because it was convenient for us to leave the car there and because we had no room for

> the Pontiac at our home. We told David Frey that the CPA shop was a heated garage and that it would have cost us a lot of money to store the Pontiac somewhere else. Richard and Robert Fileccia did not charge us any storage to leave the car at CPA and never asked us to pay them any money for storage. In other words, the Fileccias did us a favor by letting us leave my Pontiac in the repair shop and I told David Frey and Detective Romagnano this. My son and I did not tell Detective Romagnano or David Frey or anyone else from the District Attorney's Office that Richard or Robert Fileccia stole our car or otherwise refused to return my Pontiac to us. The Fileccias did not forcibly withhold our car from us nor did they ever tell us that we couldn't have it back."

206. Notwithstanding this exculpatory evidence, ADA Frey charged the Plaintiffs with seven more felonies including Grand Theft Auto and Criminal Possession of Stolen Property. See Counts 3, 6, 20, 32, 33, 76, and 79.

207. Investigations revealed that ADA Frey also recruited prosecution witness Haide Rosado by calling her on the telephone and telling her "you're one of the thousands of complaints" he received.

208. ADA Frey charged the Plaintiffs with fourteen additional crimes—Counts 10, 83, 27, 36, 37, 95, 96, 113, 155, 156, 157, 180, 181, 182—including Grand Theft Auto and Grand Larceny of money notwithstanding being in physical possession of an official DMV Investigation Report No. 6RS945937 that proved the Plaintiffs to be innocent of all charges.

209. DMV Inspector Robert Elefante's Investigation report dated 11/29/99 indicates he physically inspected Haide Rosado's automobile and determined that Plaintiff Richard Fileccia did in fact perform all of the repairs complained of. His report also reveals that Haide Rosado authorized all of the repairs and admitted that she "did not have the money for the repairs and was going to borrow from a friend."

> "I examined the Jaguar and observed the replacement parts. I operated the vehicle for some time and the brakes performed as they should. [Rosado] stated that she hears a noise on braking but I did not observe

this during my road test. The complainant also informed me that she is selling the vehicle, it's expensive to maintain. ...

[Rosado] was told that she could take the vehicle and the parts to another facility and have them installed. She told [CPA] to complete the repairs, there is no point in taking the vehicle elsewhere at this point. A few days later the vehicle was completed and the complainant called. She did not come get the vehicle.

Conclusion: During my interview with the complainant it was difficult to obtain accurate details of this complaint. [Rosado] was unsure of when she presented the vehicle to the facility. ... It is obvious as indicated by the statements included in her complaint that [Rosado] was called and given verbal estimates by CPA and did give authorization. She admitted to me that she did not have the money for the repairs and was going to borrow from a friend. ... I have been unable to obtain any evidence to support the complainant's allegations."

210.    Notwithstanding this exculpatory evidence, ADA Frey conspired and acted in concert with Haide Rosado to fabricate false evidence to initiate and procure the Plaintiffs' seizure. He coached Rosado to lie under oath long before the grand jury proceeding and later suborn her perjury.

211.    ADA Frey did all of the foregoing acts and omissions during the investigatory (plotting) stage of the proceedings.

### THE RUNNERS FABRICATE FALSE EVIDENCE TO INITITATE THE PLAINTIFFS SEIZURE AND MALICIOUS PROSECUTION

#### DMV Inspector George Filippides

212.    DMV Inspector George Filippides conspired and acted in concert with Detective Georgette Romagnano to fabricate his Investigation Report dated August 9, 2001, No. 6RS175500, to initiate and procure the Plaintiffs unlawful seizure. Filippides' fraudulent investigation report is dated more than six months prior to the grand jury proceeding and is well within the investigatory stage of the proceeding.

213.    The record evidence indicates that Inspector Filippides typed a letter for prosecution

witness George Stapleton that is addressed to the District Attorney's Office, which "begged" the prosecutor to initiate a criminal investigation against the Plaintiffs. Filippides then instructed George Stapleton to fax and mail it to ADA Frey.

214.    George Stapleton's August 11, 2001 letter states in pertinent part:

> "My name is George W. Stapleton. Over four years ago, I brought my car to CPA Auto Service, located at 1276 Castleton Avenue, Staten Island.
> ...
> Every time I would call to inquire when the car would be ready, al CPA would say is that the car needed more parts and more work ...
> In the last few weeks, I have taken this problem to NYS DMV who have been trying to investigate this matter, but CPA is utilizing stonewalling tactics to delay their investigation. **Whereupon I beg the District Attorney's office consider my case and pursue legal action as per the suggestion of NYS DMV.**"

215.    However, the sentence, "Whereupon I beg the District Attorney's office consider my case and pursue legal action as per the suggestion of NYS DMV" indicates first; that Filippides instructed Stapleton to send the letter, and second; that Filippides or ADA Frey wrote the letter because they used the word "whereupon," which is commonly used by lawyers.

216.    Furthermore, Filippides Investigation Report made countless false statements including:

> "In May, 1997, George Stapleton visited [CPA Motor Cars] to repair the A/C system and clutch on his 1986 Corvette ... The Complainant paid [CPA] $1300 but was never issued any type of estimate, invoice, or receipt (he had requested that they give him something in writing many times ...
>
> Since that time, [CPA Motor Cars] has been in possession of Mr. Stapleton's vehicle and has allegedly performed a large array of unauthorized repairs including an alleged engine overhaul, the installation of a rebuilt transmission, a new starter, engine water pump, front and rear brakes service including new rear rotors, major tune up components, battery, and assorted engine sensors, relays and harness components ...
>
> In the years that have passed, Mr. Stapleton and his family have visited the respondent facility countless times in an effort to collect his vehicle ...
>
> [CPA] to date refuses to release the vehicle ...
>
> Because the facility is rarely open to the public and monitored by

surveillance cameras, the owner will only open for people he wishes to have contact with …

I then asked the other members of [George Stapleton's] family that had any contact with [CPA Motor Cars] if they authorized any of the additional repairs. They all said absolutely not …

The repairs were never completed.

217.    On February 17, 2005, George Stapleton testified under oath in a collateral DMV hearing and contradicted all of Filippides' allegations.

218.    George Stapleton testified that he never asked for a written invoice or estimate; that he told Filippides he was always permitted to enter and exit the CPA repair facility "without a problem", on "forty (40) or so occasions," at different times of the day, the front gates of the repair shop were "open most of the time," discussed his vehicle repairs with Richard Fileccia for "hours on occasion," and the Plaintiffs never once told him "get out of here" or tried to "throw his family out or shut the door."

219.    Stapleton also testified that Plaintiff Richard Fileccia gave him a long list of parts that he installed in his Corvette; took an hour to go over the list of parts with him and his brother; they discussed each part, why it was purchased and what was done to the Corvette; that George saw "lots of parts on the floor of Richard Fileccia's workshop"; that George's brother in law (who was also an auto mechanic) saw all of the new parts on floor of the workshop; and no one ever told Plaintiff Richard Fileccia to stop the work in progress.

220.    The truth is that all the repairs on the Stapleton Corvette were authorized, necessary, and performed in a workmanlike manner.

221.    Notwithstanding this exculpatory evidence, Filippides testified falsely before the grand jury consistent with his fraudulent inspection report resulting in the Plaintiffs' being falsely accused and arrested for, *inter alia*, Grand Larceny of an automobile and criminal possession of stolen property. See Counts 2, 12, 75, 85.

222.    On March 19, 2002, Detective Georgette Romagnano executed a warrantless search and seizure of the Plaintiffs' home and office at 496 Willowbrook Road in Staten Island. See "Warrantless Break-In at 496 Willowbrook Road" below.

223.    Prosecutors found Plaintiff Richard Fileccia's auto repair orders stapled to <u>photographs</u> of the work in progress on George Stapleton's Corvette, and 54 separate auto part purchase invoices inscribed with the words "George Stapleton's 1986 Corvette."

224.    The photographs and purchase invoices predate the District Attorney's phony investigation of the Plaintiffs.

225.    The 54 invoices, bates-stamped 300403-300467, proved that all of the repairs on the Stapleton Corvette were in fact made.

226.    The Stapleton Corvette photographs, Bates-stamped 300403-300406, show the installation of <u>new</u> auto parts that were placed on the top of the Corvette during the work in progress. A new distributor cap, ignition wires, and radiator hose are clearly depicted.





227.   On April 11, 2002, at the special request of ADA Frey, Filippides inspected George Stapleton's Corvette at the NYPD Whitestone auto impound. There, he conspired and acted in concert with NYPD Detective Georgette Romagnano to fabricate a fraudulent inspection report to maintain the Plaintiffs' malicious prosecution.

228.   Filippides' fraudulent April 11, 2002 inspection report claims, among other things, that "the [Corvette's] upper radiator hose was not present, the ignition distributor, the distributor cap and rotor, and the attaching ignition wires were also removed from the engine" but purposely failed to note that the new auto parts were stored inside the automobile awaiting installation.

229.   Filippides sworn DMV testimony also revealed that NYPD Detective Georgette Romagnano took digital photographs of the entire inspection process but later destroyed most of the exculpatory photographs when demanded by the Plaintiff Robert J. Fileccia, Esq. during discovery and at trial.   ADA Frey conspired and acted in concert with Detective Romagnano to withhold and destroy her digital photograph to maintain the Plaintiffs' malicious prosecution.

230.   Notwithstanding being in physical possession of the exculpatory Corvette photographs and 54 auto parts purchase invoices, on April 22, 2002, Inspector Filippides testified falsely under oath in a closed door secret DMV hearing where he said Plaintiff Richard Fileccia did not perform "the majority" of the Corvette repairs he claims to have made.

| ALJ Michael Dorsky: | So the facility then did attempt to make repairs? |
|---|---|
| Inspector Filippides | They did do things to the vehicle, your honor, but I do not understand exactly what their motive is.   They provided a list of alleged items that were repaired. |
| | **I reviewed that list and did not see the majority of those items done.** [Tr. 4/22/02 at 16] |

231.   The Plaintiffs did not appear at the April 22, 2002 Stapleton hearing because they never received notice of it.

232.   Investigations reveal that on January 16, 2002, Filippides mailed lulling letters to the Plaintiffs' home and office that falsely claimed the Stapleton Corvette hearing was being delayed:

"The commencement of a hearing may be delayed because other, earlier scheduled hearings have resulted in insufficient personnel and hearing rooms necessary to hold the hearing sooner.  You will receive notice of the date, time, and place of the hearing as soon as one is scheduled."

233.   The truth is that the Stapleton Corvette hearing was <u>not</u> delayed. The DMV envelope was correctly addressed to the Plaintiffs' home; was stolen by ADA Frey's operatives inside the Post Office; and marked "Moved Left No Address" and "Return To Sender."  <u>See</u> ADA Frey's Mail Theft Ring below.



234.    Investigations also reveal that ADA Frey planted Inspector George Filippides in the grand jury waiting room to inflame the witnesses—before they testified—with false statements, invective, and innuendo concerning the Plaintiffs. Filippides told the grand jury witnesses, among other things, false stories that Richard and Robert Fileccia were "mafia," had connections to organized crime, and were "shaking down" a ninety-year-old woman. None of these stories were true. Filippides knowingly and intentionally tampered with witnesses to obstructed justice in violation of the plaintiffs' clearly established constitutional rights.

### NYPD Lieutenant Michael Paccione

235.    NYPD Lieutenant Michael Paccione was the second witness who testified falsely before the grand jury.

236.    Lieutenant Paccione is a "runner" who was handpicked by ADA Frey to fabricate false evidence and bribe witnesses to initiate and procure the Plaintiffs' seizure without

probable cause.

237.   Investigations reveal that Michael Paccione recruited the following prosecution witnesses into the District Attorney's black operation: Sidra Vazquez, Darlene Johnson, Edward Johnson, Paul Nicholson, Nino Cutillo, DMV Inspector Emerson Forde, and NYPD Sergeant Michael Botta.

238.   Lieutenant Paccione attempted to recruit Anthony Treglia with the promise of a class action law suit, but Treglia refused the bribe. Treglia gave the Plaintiffs' private investigators the following sworn testimony:

> "Towards the end of the year 2001, I received a telephone call from Michael Paccione, who claimed to be a licensed private investigator and a NYC Police Officer. I was given his business card from two women, Sidra Vazquez and Jeanette Pacheco, whom I formerly worked with at Time Warner Cable in Staten Island. Michael Paccione told me that he had his own private investigation agency named *MP Investigations* and that he was conducting an investigation of CPA Automotive. He asked me to look for my receipts and any other documentation in support of my DMV complaint and asked me to return his phone call when I found the desired information.
>
> Sidra Vazquez asked me to join in their "class action" law suit against Richard and Robert Fileccia and asked me to call Michael Paccione for further information. I considered Sidra Vazquez and Janette Pacheco's complaints concerning Richard and Robert Fileccia to be frivolous and did not want to get involved in what I believed to be a scandal. I did not return Michael Paccione's telephone call."

239.   On April 7, 2001, Lieutenant Paccione fabricated a materially false DMV Complaint Report No. 6RS171283 that was designed to initiate and procure the Plaintiffs' wrongful seizure. Paccione's DMV Complaint falsely claims, among other things, that Plaintiff Richard Fileccia performed unauthorized repairs to Paccione's 1989 Cadillac and charged him for repairs that were not made.

240.   On April 11, 2001, Paccione caused auto mechanic Paul Nicholson to fabricate a fraudulent automobile inspection report that falsely claimed that Plaintiff Richard

Fileccia did not install a new water pump in Paccione's 1989 Cadillac. The inspection report is in Paccione's handwriting.

241.    On June 28, 2001, Paccione arranged for his 1989 Cadillac to be inspected at Nino's Auto Repair located in Staten Island. Lieutenant Paccione invited DMV Inspector Emerson Forde to the inspection. There, he caused auto mechanic Nino Cutillo to fabricate a fraudulent automobile inspection report that falsely claimed Plaintiff Richard Fileccia did not install a new water pump or new front struts in Paccione's 1989 Cadillac.

242.    Later that afternoon, on June 28, 2001, DMV Inspector Emerson Forde met with Plaintiff Richard Fileccia at CPA Motor Cars Ltd. who gave him:

   a) a copy of photographs Richard had taken of the Paccione repairs and vehicles work in progress; and

   b) a copy of his auto part purchase invoices for parts that Ricahrd purchased to repair Paccione's automobile.

243.    Plaintiff Richard Fileccia also showed Inspector Forde the old water pump that he removed from Paccione's automobile to authenticate the repairs and the falsity of Paccione's allegations.

244.    On September 6, 2002, Inspector Forde testified under oath at a DMV hearing and admitted being shown Paccione's old water pump.

| | |
|---|---|
| Q: | Did he show you parts he removed? |
| Inspector Forde: | He showed me a couple of parts, yes. |
| Q: | He showed you a water pump? |
| Inspector Forde: | Yes. |
| Q: | Huh? |
| Inspector Forde: | Yes. |
| Q: | He showed you a heater core? |

| Judge Dorsky: | If you know. |
| Inspector Forde: | Uhh, I'm not sure ... He showed me a couple of parts in a box. |
| Q: | That he alleged – he said, "I took these out of the Paccione Vehicle?" |
| Inspector Forde: | Yes. |
| Q: | One for sure was a water pump; right? |
| Inspector Forde: | Yes, I remember the water pump. |

245. Notwithstanding the foregoing exculpatory evidence, on July 13, 2001, DMV Inspector Emerseon Forde fabricated a fraudulent DMV Investigation Report, No. 6RS171283 that falsely claimed, among other things, that Plaintiff Richard Fileccia willfully performed unauthorized repairs, willfully failed to note oral authorization on Paccione's invoice, willfully failed to provide quality repairs, and willfully failed to have adequate equipment and facilities to perform the service that were offered.

246. All of the foregoing accusations were materially false. Inspector Forde admitted under oath, among other things, that he didn't know whether or not Plaintiff Richard Fileccia had proper equipment to perform the repairs and that Paccione's oral authorization was in fact noted on the bottom of CPA's January 26, 2001 invoice.

247. Plaintiff Richard Fileccia also mailed the exculpatory work-in-progress photographs and auto parts invoices to Lieutenant Michael Paccione in hopes that he would pay his unpaid invoice in the amount of $1914.35 that was never paid.

248. On February 28, 2002, Lieutenant Paccione and auto mechanic Paul Nicholson testified falsely before the grand jury to initiate and procure the Plaintiffs' wrongful seizure and malicious prosecution without probable or reasonable cause.

249. Lieutenant Paccione falsely testified, among other things, that:

    a) Plaintiff Richard Fileccia charged for work not performed and repairs not made

on CPA Invoice dated 8/29/98; charged for parts not replaced; including struts that were not replaced; See Count 14;

b) Plaintiff Richard Fileccia charged for repairs allegedly covered under warranty on CPA Invoice dated 6/8/2000; Repair shop failed to honor limited lifetime warranty on 8/29/98 brake repairs; See Count 17;

c) Plaintiff charged for unauthorized repairs on CPA Invoice dated 1/26/01; charged money for parts not replaced including a water pump; charge money for work not performed and repairs not made including an oil leak; and charged for non quality repairs; See Count 18.

250.  The truth is that all the repairs on Lieutenant Paccione's Cadillac were authorized, necessary, and performed in a workmanlike manner.

251.  Investigations reveal that Lieutenant Michael Paccione also testified falsely that Plaintiff Richard Fileccia sent him fraudulent work-in-progress photographs of repairs performed on someone else automobile <u>years ago</u> attempting to steal his money for repair that were not performed.  See Grand Jury Exhibits 13-22.

252.  To disprove Paccione's false allegations, Plaintiff Robert J. Fileccia, Esq. inverted and magnified the Staten Island Advance newspaper article just above the screwdriver in Grand Jury Exhibit 18.



253.    Plaintiff Robert Fileccia then researched the microfilm archives at the New Dorp public library in Staten Island to confirm the date of the newspaper article to be January 18, 2001.



checks the return merchandise carts at a Wal-Mart in Fayetteville, N.C.

254. The January 18, 2001 date of the newspaper article in Grand Jury Exhibit 18 not only

disproved Paccione's false grand jury testimony but corroborated the true dates of

Plaintiff Richard Fileccia's work on Paccione's car that was completed on January 26,

2001, the date on CPA's Repair Order.  See GX 11.

255. Based upon Lieutenant Paccione's false grand jury testimony, the Plaintiffs were

wrongfully accused of 26 crimes—Counts 14, 17, 18, 117, 118, 158, 159, 160, 183, 184,

185, 119, 120, 134, 135, 186, 187, 188, 124, 125, 161, 162, 163, 121, 122, and 123—in

violation of their Fourth Amendment constitutional rights.

256. In order to cover up his criminal activity, on July 5, 2001—just one week after his car inspection at Nino's Auto Repair—Lieutenant Michael Paccione immediately sold his automobile to a man in Long Island. Investigations reveal that Paccione illegally set his mileage odometer back, sold the car for $2500, and gave a fraudulent receipt to the buyer for $500.

NYPD Sergeant Michael Botta

257. Investigations reveal that Lieutenant Paccione recruited NYPD Sergeant Michael Botta into the black operation to initiate and procure the Plaintiffs' wrongful seizure.

258. Lieutenant Paccione filed a fraudulent DMV Complaint on April 7, 2001.

259. Three days later, Sergeant Botta filed a fraudulent DMV Complaint on April 10, 2001, that falsely claims, among other things, that he was unable to gain access into the repair shop to pick up his 1993 Pontiac Grand Prix and that his vehicle has the same problem it had when he brought into CPA Motor Cars Ltd; suggesting that he paid $2372 for repairs that were never made.

260. The truth is that all the repairs on Sergeant Botta's 1993 Pontiac Grand Prix were authorized, necessary, and performed in a workmanlike manner.

261. Sergeant Botta then caused DMV Inspector Emerson Forde to fabricate a false DMV Investigation Report dated August 15, 2001 that falsely claims, among other things, Plaintiff Richard Fileccia charged Botta for non quality repairs or no repairs at all. Emerson Forde's Report states in pertinent part, "At a glance, I observed that the spark plug in #1 cylinder was loose, which may have caused the misfire. Mr. Botta was advised to correct the problem. On 8/7/01 Mr. Botta called the office and said that the

vehicle was undergoing engine repairs as a result of the non quality repair performed by [Plaintiff Richard Fileccia] and he would provide the old parts and the invoice to substantiate his claim."

262.  Investigations reveal, however, that engine cylinder number 1 in a 1993 Pontiac Grand Prix <u>cannot</u> be seen at a glance because it is in the back of the engine, up against the firewall, and needs partial disassembly of the engine in order to see it.   Emerson Forde lied in his report to provide Sergeant Botta with a fraudulent expert opinion. Inspector Forde and Sergeant Botta conspired and acted in concert to initiate and procure the Plaintiffs' seizure without probable or reasonable cause.

263.  Investigations reveal that Sergeant Botta testified falsely before the grand jury that Plaintiffs Richard and Robert Fileccia performed no repairs to his 1993 Grand Prix, stole his money, and held his car for ransom until he paid for repairs that were never made.

264.  Sergeant Botta's false grand jury testimony caused the Plaintiffs to be falsely accused and arrested for Grand Theft Auto, Grand Larceny of Money, and Criminal Possession of Stolen Property.  See Counts 4, 21, and 77.

265.  On March 19, 2002, Detective Georgette Romagnano executed a warrantless search and seizure of the Plaintiffs' home and office at 496 Willowbrook Road in Staten Island.  See "Warrantless Break-In at 496 Willowbrook Road" below. Prosecutors found Plaintiff Richard Fileccia's auto repair orders stapled to <u>photographs</u> of the work in progress on Sergeant Botta's Grand Prix, and numerous auto part purchase invoices inscribed with the words "Mike Botta's 1993 Pontiac Grand Prix."

266.  The photographs and invoices pre-date the District Attorney's phony investigation of the Plaintiffs.

267.    The auto parts invoices, bates-stamped 301012-301017, proved that all of the repairs on the Botta Grand Prix were in fact made.

268.    The work-in-progress photographs, Bates-stamped 300999-301010, prove that Sergeant Botta knowingly and intentionally committed perjury before the grand jury and conspired and acted in concert with DMV Inspector Forde and Lieutenant Paccione to initiate and procure the Plaintiffs' wrongful seizure.

269.    The following photograph, Bates stamped 300999, depicts a ruptured head gasket that was removed from Sergeant Botta's 1993 Grand Prix.  The photograph proves that the repairs Richard Fileccia performed on Botta's vehicle were in fact <u>necessary</u>.



270.    Once again, the newspaper underneath the ruptured head gasket corroborated the dates Richard Fileccia worked on Sergeant Botta's automobile.



**ndFRONT**

GOSSIP ■ EDITORIAL                    TUESDAY, FEBRUARY 27, 2001

## Islander OK after botched surgery

■ 6 doctors and a nurse at Long Island College Hospital are suspended after operation starts on wrong side of man's brain

By STEPHANIE SLEPIAN

A Castleton Corners man is in Long Island College Hospital with matching 13-inch scars on each side of his head after neurosurgeons operated on the wrong side of his brain.

Kevin Walsh, 41, a lifelong Islander and a former city firefighter, suffered a seizure last Tuesday while in custody at the Brooklyn House of Detention and was rushed to the Brooklyn Heights hospital. Neurosurgeons then operated on the left side of his brain after a CAT scan was apparently placed backwards on a viewing screen.

Surgeons immediately realized their mistake once the incision was made and after re-examining the CAT scan, sewed up the left side and proceeded to successfully operate on the right side of Walsh's brain.

Walsh is listed in stable condition and his attorney expects him to be released later in the week.

Dr. Rene Katzen, 44, who performed the operation, and Dr. Mike W. Chou, 37, who, according to his lawyer, prepped the patient for surgery but was not in the operating room, were suspended after the procedure to remove a potentially fatal blood clot.

In addition, it was reported today that four other doctors and a nurse also have been suspended. Their names were not released, according to the New York Post.

The hospital and the state Department of Health are investigating.

"The hospital is continuing its internal review of the case, and has suspended the physicians involved since well-established hospital policies were clearly violated," the hospital said yesterday. "The incident was reported promptly to the appropriate regulatory agencies and the hospital will cooperate fully with their investigation." The hospital declined further comment

Neither of the suspended doctors is report-

PLEASE SEE BRAIN PAGE A 19

271.  In order to cover up his criminal activity, on October 30, 2001 Sergeant Botta sold his automobile to Salvatore Incorvaia. There was nothing wrong with the vehicle.

### Haide Rosado

272.  ADA Frey recruited Haide Rosado.

273.  Investigations reveal that Haide Rosado testified falsely before the grand jury on March 7, 2002 that the Plaintiffs' stole her money for repairs that were not made; held her car ransom until she paid for repairs that were not performed; and intentionally damaged her car to generate future repairs.

274.  Defendant Haide Rosado told the Plaintiffs' private investigator that Richard and Robert Fileccia damaged her 1987 Jaguar and that her family members had to push it back to her home which was a couple of blocks away from the repair facility. Rosado told investigators that the Plaintiffs stole her car because they used a garageman's lien to [lawfully] retain the vehicle as security until payment was made. <u>See</u> New York Lien

Law §184(1).

275. The Plaintiffs' were charged with 14 crimes—Counts 10, 83, 27, 36, 37, 95, 96, 113, 155, 156, 157, 180, 181, 182—as a result of Rosado's false grand jury testimony including Grand Theft Auto, Petit Larceny, and Criminal Mischief.

276. The truth is that all the repairs on Haide Rosado's 1987 Jaguar were authorized, necessary, and performed in a workmanlike manner. The Plaintiffs did not damage or "steal" her car.

277. On June 23, 2003, criminal defense lawyer Herald Price Fahringer sent the following photographs that pre-date the District Attorney's phony investigation to State Supreme Court Judge Leonard Rienzi to prove the Plaintiffs <u>innocent</u> of Haide Rosado's false accusations.

278. Below is a photograph of the old defective brake caliper that Plaintiff Richard Fileccia removed from Haide Rosado's Jaguar.



279. Below is a picture of the newly remanufactured caliper that Plaintiff Richard Fileccia

installed in Haide Rosado's vehicle.





280.    In order to continue the Plaintiffs' malicious prosecution, Haide Rosado told investigators that she sold her 1987 Jaguar to a man named "Eddie" who lives in Los Angeles California.

281.    The truth is Rosado purposely junked her car at Edkins Junk Yard, only blocks from her home, in order to destroy the exculpatory evidence notwithstanding standing Supreme

Court Orders to make the car available to the Plaintiffs for inspection. The Plaintiffs' documented the automobiles chain of custody and performed a forensic mechanical inspection on it proving that all the repairs were in fact performed <u>and</u> that Rosado knowingly and intentionally committed perjury before the grand jury. The following is a picture of Rosado's 1987 Jaguar in Edkin's Junk Yard in Staten Island.



**Edward Johnson and Darlene Johnson**

282. Lieutenant Michael Paccione recruited Edward and Darlene Johnson.

283. On April 6, 2001, Edward and Darlene Johnson fabricated a false written statement concerning the Plaintiffs and their automobile and gave it to Lieutenant Paccione, who then filed his fraudulent DMV Complaint on April 7, 2001.

284. Investigations reveal that Edward and Darlene Johnson testified falsely before the grand jury that the Plaintiffs' stole their money ($750) for repairs not made; took their car apart and never put it back together; and held their car ransom for eight months until they

towed it away.

285. The Plaintiffs' were charged with 4 crimes—Counts 8, 81, 23, and 40—as a result of Edward and Darlene Johnson's false grand jury testimony including Grand Theft Auto, Petit Larceny, and Criminal Mischief.

286. The truth is that Edward and Darlene Johnsons' 1989 Toyota Corolla needed a replacement used motor. Plaintiff Richard Fileccia charged the Johnson's $150 to disassemble the engine, and later requested a $500 deposit for the purchase of a used motor from an auto salvage (junk) yard. Not being able to locate a suitable junk yard motor, Plaintiff Richard Fileccia reimbursed Edward Johnson in full: Check No. 1290 dated 6/1/99 for $500 and Check No. 1344 dated 7/3/99 for $150.00. The Plaintiffs did not damage or "steal" the Johnson's automobile.

287. Investigations reveal that Edward Johnson never told his wife Darlene that the Plaintiff Richard Fileccia reimbursed their money. Darlene Johnson told investigators that her husband never gave her any of the reimbursement money.

288. Edward and Darlene Johnson's false grand jury testimony initiated and procured the Plaintiffs' seizure and malicious prosecution.

Sidra Vazquez

289. Lieutenant Michael Paccione recruited Sidra Vazquez.

290. On April 6, 2001, Sidra Vazquez fabricated a false written statement concerning the Plaintiffs and her automobile and gave it to Lieutenant Paccione, who then filed his fraudulent DMV Complaint on April 7, 2001.

291. Investigations reveal that Sidra Vazquez testified falsely before the grand jury that the Plaintiffs' stole her money ($6000) for repairs not made or intentionally done incorrectly;

and allegedly towed her 1989 Mercury Sable away from the repair shop and junked it because the Plaintiffs' damaged it beyond repair.

292.    Sidra Vazquez told investigators that the Plaintiffs "stole" her car because they used a garageman's lien to [lawfully] retain the vehicle as security until payment was made. See New York Lien Law §184(1). Vasquez admitted telling ADA Frey about the Plaintiffs' garageman's lien but withheld this exculpatory evidence from the grand jury.

293.    The Plaintiffs' were charged with 5 crimes—Counts 7, 80, 22, 34, and 35—as a result of Sidra Vazquez's false grand jury testimony including Grand Theft Auto, Grand Larceny of Money, and Criminal Mischief.

294.    The truth is that all the repairs on Sidra Vasquez's 1989 Mercury Sable were authorized, necessary, and performed in a workmanlike manner. The Plaintiffs did not damage or "steal" her car.

295.    Sidra Vasquez did not junk her car.   Investigations reveal that she drove her car for more than a year after she drove it out of the CPA repair shop; and after putting exactly 7041 more miles on the odometer, the car was seized by the County Marshall for unpaid tickets and sold at auction on April 16, 1999.   Vasquez's 1989 Mercury Sable was then driven for more than two more years without any other repairs.

296.    Sidra Vasquez did not pay a dime for the repairs.  Her insurance carrier, StarCare paid a little over $3000 for extensive repairs.  See GX 53-55.

297.    Sidra Vasquez's false grand jury testimony initiated and procured the Plaintiffs' seizure and malicious prosecution.


Alistair Abernethy and Ann Abernethy

298. Alistair and Ann Abernethy filed a fraudulent DMV Complaint on January 16, 2001, No. 6RS166936, that falsely claims, among other things, that they were unable to gain access into the repair shop to pick up their 1989 Mitsubishi Sigma, and that the Plaintiffs performed unauthorized and unnecessary repairs.

299. Alistair Abernethy then caused DMV Inspector Emerson Forde to fabricate a false DMV Investigation Report dated March 6, 2001 that falsely claims, among other things, Plaintiff Richard Fileccia "willfully failed to provide quality repairs", performed unauthorized repairs and unnecessary repairs, and failed to send him or Abernethy all of the invoices for the parts which suggests that Richard Fileccia charged for repairs that were not made.

300. Emerson Forde fabricated his false report to provide Alistair Abernethy with a fraudulent expert opinion. Inspector Forde, Alistair Abernethy, and Ann Abernethy conspired and acted in concert to initiate and procure the Plaintiffs' seizure without probable or reasonable cause.

301. Investigations reveal that Alistair and Ann Abernethy testified falsely before the grand jury, that they were unable to gain access into the repair shop to pick up their 1989 Mitsubishi Sigma; that the Plaintiffs performed unauthorized and unnecessary repairs; charged for repairs not made; and intentionally damaged their vehicle to generate future repairs. Alistair Abernethy also falsely testified that he was unable to gain access to his wheelchair that, unknown to the Plaintiffs, was in the trunk of his car.

302. The truth is that all the repairs on Alistair and Ann Abernethy's 1989 Mitsubishi Sigma were authorized, necessary, and performed in a workmanlike manner. The Plaintiffs did not damage or "steal" their automobile or wheelchair.

303. The Plaintiffs' were charged with 6 crimes—Counts 9, 82, 15, 16, 41, and 42—as a result of Alistair and Ann Abernethy's false grand jury testimony including **Larceny of a wheelchair**, Grand Theft Auto, Grand Larceny of Money, and Criminal Mischief.

304. On March 19, 2002, Detective Georgette Romagnano executed a warrantless search and seizure of the Plaintiffs' home and office at 496 Willowbrook Road in Staten Island. See "Warrantless Break-In at 496 Willowbrook Road" below. Prosecutors found Plaintiff Richard Fileccia's auto repair orders stapled to <u>photographs</u> of the work in progress on Alistair and Ann Abernethy's 1989 Mitsubishi Sigma, and numerous auto part purchase invoices inscribed with the words "Al Abernethy's 1989 Mit. Sigma."

305. The photographs and invoices pre-date the DA's phony investigation of the Plaintiffs.

306. The auto parts invoices, bates-stamped 300343-300356, proved that all of the repairs on Abernethy's Mitsubishi Sigma were in fact made.

307. The work-in-progress photographs, Bates-stamped 300333-300342, prove that the repairs were in fact made; that Alistair and Ann Abernethy knowingly and intentionally committed perjury before the grand jury; and conspired and acted in concert with DMV Inspector Forde to initiate and procure the Plaintiffs' wrongful seizure.

308. The following photographs, Bates stamped 300333 and 300335, show Plaintiff Richard Fileccia's rebuilding Abernethy's engine. The photographs prove that the repairs were in fact made.





309.  In order to maintain the Plaintiffs' malicious prosecution, on May 23, 2005, Alistair Abernethy testified falsely under oath in a DMV hearing that, among other things, his car overheated after he picked it up from the CPA repair facility and that one of the four wheels did not turn and had to be dragged through the streets all the way home.

310.  In order to conceal the exculpatory evidence and continue the Plaintiffs' malicious

prosecution, on January 14, 2003, Alistair and Ann Abernethy gifted their automobile to Eileen Tritto (Ann Abernethy's sister) and drove it out to New Hyde Park NY, notwithstanding standing State Supreme Court Orders to make the car available to the Plaintiffs' for inspection.

## Eileen Tritto

311.    In order to conceal the exculpatory evidence and continue the Plaintiffs' malicious prosecution, Eileen Tritto repeatedly denied the Plaintiffs' private investigators' multiple requests to inspect her 1989 Mitsubishi Sigma, notwithstanding standing State Supreme Court Orders to make the car available to the Plaintiffs' for inspection.

312.    In order to conceal the exculpatory evidence and continue the Plaintiffs' malicious prosecution, Eileen Tritto concealed the whereabouts of the 1989 Mitsubishi Sigma after she traded it in for a new automobile and lied to investigators that she gave it to a charity but couldn't remember its name.

313.    In order to conceal the exculpatory evidence and continue the Plaintiffs' malicious prosecution, Eileen Tritto also failed to appear in a May 23, 2005 DMV hearing after being properly served with a subpoena to testify.

## Isabel Cornier

314.    ADA Frey recruited Defendant Isabel Cornier.

315.    Isabel Cornier fabricated a fraudulent DMV Complaint Report, No. 6RS065479, that falsely claims, among other things, that she was unable to gain access into the repair shop to retrieve her 1985 Mercury Cougar and that the Plaintiffs *may have* charged for repairs not made.

316.    DMV Inspector Emerson Forde fabricated a false DMV Investigation Report dated March 6, 2001 (the same date he filed a fraudulent report concerning Alistair Abernethy), that falsely claims, among other things, Plaintiff Richard Fileccia "failed to repair the vehicle properly."

317.    Emerson Forde later testified under oath in a DMV hearing and admitted that he <u>never</u> inspected Isabel Cornier's automobile, does not know if Plaintiff Richard Fileccia repaired the car properly; and therefore lied in his investigation report.

318.    Emerson Forde fabricated his report to provide Isabel Cornier with a fraudulent expert opinion to initiate and procure the Plaintiffs' seizure without probable or reasonable cause. Forde and Cornier conspired and acted in concert to continue the Plaintiffs'' malicious prosecution.

319.    Investigations reveal that Isabel Cornier testified falsely before the grand jury that the Plaintiffs' charged her for repairs not made, parts not supplied; and held her car for ransom.

320.    The truth is that all the repairs on Isabel Cornier's 1985 Mercury Cougar were authorized, necessary, and performed in a workmanlike manner. The Plaintiffs did <u>not</u> "steal" or otherwise withhold her car from her.

321.    The Plaintiffs' were charged with 3 crimes—Counts 13, 86, and 26—as a result of Isabel Cornier's false grand jury testimony including Grand Theft Auto and Larceny of money.

322.    On March 19, 2002, Detective Georgette Romagnano executed a warrantless search and seizure of the Plaintiffs' home and office at 496 Willowbrook Road in Staten Island. See "Warrantless Break-In at 496 Willowbrook Road" below. Prosecutors found Plaintiff Richard Fileccia's auto repair orders stapled to numerous auto part purchase invoices

inscribed with the words "Isabel Cornier's 1985 Mercury Cougar."

323. The invoices pre-date the District Attorney's phony investigation of the Plaintiffs.

324. The auto parts invoices, bates-stamped 300357-300359, proved that all of the repairs on Isabel Cornier's car were in fact made and that she knowingly committed perjury in the grand jury.

325. Moreover, on May 17, 2005, Isabel Cornier testified under oath in a DMV hearing and admitted that she had a dispute with the repair shop as to *who* was going to pay the $35 towing fee to transport her car back to her empty driveway. Cornier admitted under oath that her car was parked behind the repair shop in a grammar school parking lot; unobstructed; the car had no insurance, no registration, no plates; and she could have and eventually did tow the vehicle anytime she wanted. The car was not held for ransom.

326. In order to conceal the exculpatory evidence and continue the Plaintiffs' malicious prosecution, Isabel Cornier donated her 1985 Mercury Cougar to charity, notwithstanding standing State Supreme Court Orders to make the car available to the Plaintiffs' for inspection.

Walter Parks

327. Cornier then recruited Walter Parks, an auto mechanic, to fabricate a fraudulent inspection report as an alibi for her junking the car and violating a State Supreme Court Order.

328. Walter Parks phony inspection report, No. 4325, proclaims that Cornier's automobile had "low to no oil pressure, possible overheat, unable to run vehicle."

329. Cornier and Parks conspired and acted in concert to withhold and destroy exculpatory evidence and continue the Plaintiffs' malicious prosecution without probable or

reasonable cause.

330.    On November 3, 2005, Walter Parks testified falsely under oath in a DMV hearing to continue the Plaintiffs malicious prosecution.

331.    The Plaintiffs and their investigators located Cornier's 1985 Mercury Cougar in a junk yard, documented its chain of custody, and performed a forensic mechanical inspection on the vehicle. All the repairs were in fact performed. There was nothing wrong with the engine oil pressure. The Plaintiffs' expert took the following picture that reveals brand new brake shoes, brand new wheel cylinder, brand new brake hardware; and brand new brake drum—that were never driven on.



George Stapleton, Frank Stapleton, Patricia Goebel, Frank Goeobel, Georgette Edkins, Steven Demizio, and Detective Georgette Romagnano

332. George Stapleton, Frank Stapleton, Patricia Goebel, Frank Goebel, Georgette Edkins, Steven Demizio, and Detective Georgette Romagnano conspired and acted in concert to fabricate DMV Complaint No. 6RS175500, dated June 27, 2001, to initiate and procure the Plaintiffs' seizure and malicious prosecution.

333. Steven Demizio used his home fax machine to transmit fraudulent documents between the co-conspirators.

334. The fraudulent DMV Complaint contains a 3-page typed letter that falsely states, in pertinent part, "My brother and the rest of our family have been trying to get his car back for over four years ... If I went to the shop with my family, they wouldn't let anyone in ... I hope someone can finally help us get George's car back."

335. However, on February 17, 2005, George Stapleton testified under oath in a DMV hearing and confessed that he was always permitted to enter and exit the CPA repair facility "without a problem", on "forty (40) or so occasions," at different times of the day, the front gates of the repair shop were "open most of the time," discussed his vehicle repairs with Richard Fileccia for "hours on occasion," and the Plaintiffs never once told him "get out of here" or tried to "throw his family out or shut the door."

336. Investigations reveal that George Stapleton, Frank Stapleton, Patricia Goebel, Frank Goebel, Georgette Edkins, and Detective Georgette Romagnano testified falsely before the grand jury claiming that the Plaintiffs' refused to return George Stapleton's 1986 Corvette for more than four year and were trying to "steal" it.

337. The Defendants failed to disclose to the grand jury, *inter alia*, that George Stapleton was

diagnosed with schizophrenia; was unable to drive an automobile for some time; was ordered to take a mandatory leave of absence from the US Post Office where he was employed; abandoned his automobile at the CPA repair facility for years; failed to remit payment of $6000 to the repair shop for authorized services rendered; and that Plaintiffs implemented a possessory garageman's lien pursuant to New York Lien Law §184(1).

338. The record evidence indicates that the Defendants conspired and acted in concert to steal more than $6000 of honest services from Plaintiff Richard Fileccia who was never paid.

339. The Plaintiffs' were charged with 28 crimes—Counts 2, 12, 75, 85, 54, 57, 58, 59, 60, 69, 70, 55, 61, 62, 63, 64, 71, 72, 56, 65, 66, 67, 68, 73, 74, 87, 88, and 89—as a result of the Defendant's false grand jury testimony including Grand Theft Auto and Criminal Possession of stolen property.

340. In order to conceal the exculpatory evidence and continue the Plaintiffs' malicious prosecution, on April 12, 2002, ADA Frey unlawfully released Stapleton's Corvette from police custody directly into the hands of Patricia Goebel in violation of standing State Supreme Court orders and PL §450.10.

341. Two months later, in June 2002, George Stapleton sold his 1986 Corvette to an auto mechanic, Steven Demizio, to conceal the exculpatory evidence and continue the Plaintiffs' malicious prosecution. George Stapleton's brother in law, Frank Goebel, brokered the deal with Demizio, who was Frank Goebel's supervisor at Pioneer Transportation Corporation in Staten Island. The foregoing Defendants knew there were standing State Supreme Court Orders to make the Corvette available for inspection by the Plaintiffs and knowingly violated those orders.

342. George Stapleton, Frank Stapleton, Patricia Goebel, Frank Goebel, Georgette Edkins,

Detective Romagnano, Steven Demizio and ADA Frey conspired and acted in concert to conceal exculpatory evidence and continue the Plaintiffs' malicious prosecution.

Steven Demizio

343.   Within days of Steven Demizio taking possession of the Corvette, Plaintiffs' private investigators asked him if the Plaintiffs could inspect the vehicle.   Demizio refused to cooperate, hid the Corvette, and would not permit a visual inspection of the automobile.

344.   On July 22, 2002, Demizio was served with a written notice that demanded:

> "In light of the clear stipulations and agreements made in the presence of Judge Rienzi, I am requesting that you [ADA Frey] advise Mr. Demizio not to touch the Corvette and that touching the Corvette will be construed and prosecuted as tampering with evidence and I request that you now impound the Corvette as evidence in this case."

345.   At midnight on the evening of October 4, 2002, Steven Demizio was seen altering the appearance of the 1986 Corvette in violation of standing State Supreme Court orders.



346.    Demizio parked commercial buses across the entrance into Pioneer Transportation Corporation to obstruct visibility and access into the workshop.

347.    Investigations reveal that immediately after Demizio altered the Corvette's appearance, he falsely claimed that he invested $6000 into the Corvette trying to take credit for and cover up the work previously performed by Plaintiff Richard Fileccia. **Demizio's conversations were recorded.**

348.    Demizio attempted to conceal Plaintiff Richard Fileccia's mechanical repairs on the Corvette to continue the Plaintiffs malicious prosecution.

349.    Steven Demizio recruited auto mechanics Robert Girod, Eric Paulsen, Michael Przybyszewski, and Nicholas Williams to help him alter the Corvette, who knowingly violated standing Supreme Court Orders to continue the Plaintiffs malicious prosecution.

350.    Steven Demizio, Robert Girod, Eric Paulsen, Michael Przybyszewski, and Nicholas Williams failed to appear in DMV hearings—despite having been properly served with so-ordered subpoenas signed by the Hon. Marc Berger—to conceal exculpatory evidence and testimony and continue the Plaintiffs' malicious prosecution.

351.    Investigations reveal that Steven Demizio conspired and acted in concert with ADA Frey and DMV Inspector George Filippides to conceal exculpatory evidence and testimony and continue the Plaintiffs' malicious prosecution. Demizio admitted to investigators that ADA Frey told him that he doesn't have to go to the DMV hearings if he did not want to. Inspector Filippides testified under oath that he had previous spoken to Steven Demizio on more than one occasion concerning the Plaintiffs' requests to inspect the Corvette.

352.    Recorded conversations reveal that Steven Demizio was informed that DMV Inspector George Filippides previously testified falsely under oath that Plaintiff Richard Fileccia

did not perform "the majority" of repairs he claims to have made.

353.    Recorded conversations and other evidence indicate that Steven Demizio knowingly and intentionally made overt acts to conceal the $6000 of repairs previously performed by Plaintiff Richard Fileccia in order to cover up Inspector George Filippides' perjured testimony in the DMV hearings (misprision of felony) and fraudulent Corvette inspection report he fabricated on April 11, 2002 with Detective Georgette Romagnano.

354.    On June 25, 2004, Steven Demizio sold his 1986 Corvette to the Plaintiffs for $15,000 knowing they desperately needed the automobile to defend themselves from the false accusations pending against them. **He extorted the Plaintiffs for almost three times the book value of the automobile.** Demizio knew he was selling the Plaintiffs arrest evidence.

355.    The June 25, 2004 Bill of sale indicates that Demizio was required to surrender all of his auto part invoices, negatives, and photographs of the work that he performed on the Corvette while it was in his possession.

356.    Investigations reveal that Steven Demizio knowingly violated the agreement and withheld certain auto part invoices, negatives, and photographs that proved the Plaintiffs to be innocent of the pending criminal charges. Demizio also withheld this exculpatory evidence to conceal Inspector George Filippides' perjured testimony in the DMV hearings (misprision of felony) and fraudulent Corvette inspection report he fabricated on April 11, 2002 with Detective Georgette Romagnano.

357.    Investigations reveal that Steven Demizio also submitted fraudulent air conditioning invoices to the Plaintiffs to continue their malicious prosecution and to conceal Inspector George Filippides' perjured testimony in the DMV hearings (misprision of felony).

358. The Plaintiffs' investigation of Steve Demizio is ongoing.

Steven Orlando and Allyn Crawford, Esq.

359. Plaintiff Robert J. Fileccia, Esq. received *Rosario* material at the onset of his tax trial in Indictment 23/2004, which included Steven Orlando's and Allyn Crawford, Esq.'s grand jury testimony in the Car Indictment.

360. Steven Orlando testified falsely before the grand jury to initiate and procure the Plaintiffs wrongful seizure and malicious prosecution. Steven Orlando falsely claimed, among other things, that Plaintiff Richard Fileccia "kept making repairs on his Astrovan to offset his rent" and every time Steven Orlando brought his Astrovan in for another repair, Plaintiff Richard Fileccia would say "there's something else wrong."

361. Steven Orlando and ADA Frey conspired and acted in concert to deceive the grand jury into believing that Plaintiff Richard Fileccia was damaging Steven Orlando's Astrovan to generate future repairs and or performing unnecessary repairs in order to offset his monthly rent.

362. Steven Orlando's actual grand jury testimony reveals that he knowingly and intentionally committed perjury and deceived the grand jury into believing that all of the repairs being performed by Richard Fileccia were to the same Chevy Astrovan. However, when you compare Steven Orlando's false grand jury testimony to Grand Jury Exhibits 98 and 99, it is revealed that both he and ADA Frey are talking about two entirely **different** vehicles.

363. Grand Jury Exhibit 98 is a CPA Repair Order dated 9/24/01 for a 1987 Chevy Astrovan.

364. Grand Jury Exhibit 99 is a CPA Repair Order dated 10/25/01 for a 1999 Chevy Van Express.

365. The following is Steven Orlando's materially false and misleading grand jury testimony:

86

| ADA Frey: | This is in Evidence as Exhibit 98. What kind of work was done to the Chevy Astrovan? |
| Steven Orlando: | Brakes. |
| ADA Frey: | Okay. |
| Steven Orlando: | Just brakes, that was it. |
| ADA Frey: | And he charged you how much in total. |
| Steven Orlando: | $568.31. ... |
| ADA Frey: | Okay. Now, I'd like to direct your attention to October 25th of 2001. Did you have more work done to the Chevy Astrovan? |
| Steven Orlando: | Yes. |
| ADA Frey: | What kind of work was done? |
| Steven Orlando: | I believe it was brakes again. ... |
| ADA Frey: | How much did he charge you for that? |
| Steven Orlando: | $864.33. ... |
| ADA Frey: | Okay, so the first time you brought it, you had him do the brakes. He gave it back, said there's something else wrong. You brought it in for that. He repaired that, and he said something else was wrong? |
| Steven Orlando: | Yes. |
| ADA Frey: | Did you actually pay him the money, or was he offsetting that on his rent? |
| Steven Orlando: | He was offsetting on his rent. Since we moved there, he's never paid us rent. |
| ADA Frey: | Okay. So, he saw you had an Astrovan, and he kept making repairs on that Astrovan in order to offset his rent? |
| Steven Orlando: | And two of our other vehicles as well. |
| | [Steven Orlando's Grand Jury Testimony pages 8-11.] |

366.   The truth is that all the repairs on Steven Orlando's 1987 Chevy Astrovan and 1999

Chevy Van Express were authorized, necessary, and performed in a workmanlike

manner.

***

367.   The following pertains to Allyn Crawford's false grand jury testimony.

368.   As explained earlier, on July 18, 2001, Plaintiff Robert J. Fileccia, Esq. sold his

commercial building to Steven and Lori Orlando. Allyn Crawford Esq. represented the Orlandos for the real estate transaction.

369. Defendant Allyn Crawford testified falsely before the grand jury to initiate and procure the Plaintiffs wrongful seizure and malicious prosecution. Crawford falsely claimed, among other things, that (a) <u>all</u> of the money at closing was paid to Robert Fileccia, and (b) that the Plaintiffs stole security cameras and a VCR before vacating the premises.

370. Allyn Crawford knew that his grand jury testimony was materially false because his real estate closing file that appears as Grand Jury Exhibit 33 in Robert Fileccia's tax trial contains a "CLOSING STATEMENT"—Bates-stamped 001759—which lists a check payable to Plaintiff Richard Fileccia for $92,675.96. A copy of the actual $92,675.96 check to Richard Fileccia also appears in Crawford's closing file and is Bates-stamped 001929.

371. The record evidence indicates Robert Fileccia was <u>not</u> paid all of the money at closing.

372. Allyn Crawford conspired and acted in concert with Steven Orlando, Lori Orlando, and ADA Frey to trick the grand jury into believing that Plaintiff Robert Fileccia was guilty of money laundering and tax evasion.

373. Plaintiff Robert Fileccia was indicted for tax evasion on January 30, 2004 based upon fraud, perjury, and the suppression of exculpatory evidence. <u>See</u> COMPLAINT filed on February 5, 2010, in United States District Court Eastern District of New York, <u>Robert J. Fileccia v. The City of New York et al</u>., Case No. 1:2010cv00530.

374. Furthermore, the Plaintiffs did <u>not</u> steal security cameras or a VCR from Steven Orlando before vacating the premises. Within weeks of his false grand jury testimony, Allyn Crawford filed an answer in NYC Civil Court defending Steven Orlando in Robert

Fileccia's breach of contract law suit. Crawford's answer claims that the Plaintiffs "broke" the VCR before vacating the premises. It did not say the Plaintiffs' stole the VCR. The Plaintiffs did <u>not</u> break or steal the VCR.

375. The Plaintiffs' were charged with 15 crimes—Counts 24, 97, 105, 106, 107, 128, 129, 142, 143, 144, 145, 167, 168, 169, and 170—as a result of Steven Orlando and Allyn Crawford's false grand jury testimony including Petit Larceny of a security camera.

376. Steven Orlando knowing and intentionally

    a) testified falsely before the Car Indictment grand jury (62/2002);

    b) testified falsely before the Tax Indictment grand jury (No. 23/2004);

    c) testified falsely before Robert Fileccia's Tax Trail jury that was dismissed on February 7, 2007 in favor of the accused; and

    d) conspired and acted in concert with ADA Frey and others to steal the Plaintiffs' mail for more than five (5) years.

377. Steven Orlando falsely testified in all of the foregoing proceedings to initiate, procure, and continue the Plaintiffs wrongful seizure and malicious prosecution without probable or reasonable cause.

### NYPD Sergeant Obokkobits, Police Officer Silverio, Sergeant Phillpotts, and Deputy Chief Jack J. Trabitz

378. On February 27, 2007, the Car Indictment was dismissed. Investigations reveal that the Richmond County District Attorney's Office sent the 17,000 Stolen Fileccia Records and other exculpatory evidence seized during the warrantless search and seizure at 496 Willowbrook Road to all five of the NYC Property Clerks intending to destroy the evidence.

379.    The Plaintiffs and their investigators located the Stolen Fileccia Records in the Bronx Property Clerk Division and learned that it was sealed in plastic shrink wrap to maintain the integrity of the evidence.

380.    The Plaintiffs requested the Bronx Property Clerk maintain the shrink wrap seal on the containers and safeguard the Fileccia Records and other exculpatory evidence contained in the following NYPD property clerk vouchers: N628632, N625894, L044000, L044001, L044002, L044003, M052291, M052292, M052293, B010187V, and 04C04144.

381.    The Plaintiffs requested the five NYPD Property Clerks maintain the chain of custody of the evidence.

382.    The Plaintiffs informed the NYPD Property Clerks that the sealed evidence storage boxes likely contained stolen United States Mail that ADA Frey and or his operative misappropriated and planted there.

383.    Notwithstanding having received notice by certified mail correspondence and recorded telephone conversations, the NYPD Property Clerks broke the plastic shrink wrap seal on the evidence and re-distributed the Stolen Fileccia Records to other NYPD Property Clerks destroying the chain of custody and integrity of the evidence.

384.    The NYPD Property Clerks Obokkobits, Silverio, Phillpotts, and Deputy Chief Jack J. Trabitz conspired and acted in concert with the Richmond County District Attorney's Office to destroy the chain of custody and integrity of the evidence.

385.    The NYPD Property Clerks Obokkobits, Silverio, Phillpotts, and Deputy Chief Jack J. Trabitz have failed and refused to return the Plaintiffs' property.

## Notice Defendants

386. This section is designed to place certain Defendants on notice of the nature of the Plaintiffs' accusations against them that will be set forth in detail and with specificity in the forthcoming First Amended Complaint.

387. Defendant Bruce Knoll conspired and acted in concert with ADA Frey and others to withhold and destroy exculpatory evidence by concealing the whereabouts of Isabel Cornier's automobile, Michael Paccione's automobile, Alistair Abernethy's automobile, Michael Botta's automobile, and George Stapleton's automobile. Defendant Knoll also conspired and acted in concert to aid and abet ADA Frey's mail theft ring by repeatedly failing to change the Plaintiffs' mailing address despite the Plaintiffs' repeated requests. Defendant Knoll also concealed exculpatory testimony and evidence by making patently frivolous objections, by misusing ADA Frey's Orders of Protection, and by coaching witnesses to obstruct justice.

388. Defendant Michael Sandler conspired and acted in concert with the Staten Island District Attorney's Office to interrupt the ongoing DMV hearings to conceal and destroy exculpatory evidence to continue the Plaintiffs' wrongful seizure and malicious prosecution. Investigations reveal that Defendant Sandler also fabricated false DMV Investigation reports and conspired and acted in concert with DMV Inspectors George Filippides and Emerson Forde to initiate and continue the Plaintiffs' malicious prosecution.

389. Defendant Loraine Wilson knowingly withheld exculpatory DMV FOIL documents from the Plaintiffs.

390. Defendant Thomas Burns fabricated a fraudulent inspection report in reference to

prosecution witness Vincent Cheeseman's automobile to initiate and procure the Plaintiffs wrongful seizure and malicious prosecution.

391.   Defendant John LoIacono fabricated a fraudulent inspection report in reference to prosecution witness William Archer's automobile to initiate and procure the Plaintiffs wrongful seizure and malicious prosecution.

392.   Defendant Steven Reiss concealed and withheld exculpatory evidence, Claire Fama's automobile, from the Plaintiffs to continue their wrongful seizure and malicious prosecution.

393.   Defendants NYPD Sergeants Gentile and Viola conspired and acted in concert with ADA Frey to destroy prosecution witness Lydia Boyance's automobile that was in police custody notwithstanding State Supreme Court Orders to safeguard the automobile for the Plaintiffs' inspection.

394.   Defendant Julia King testified falsely before the grand jury that Plaintiffs stole her money and failed to perform repairs to initiate and continue the Plaintiffs malicious prosecution.

395.   Defendant Lydia Boyance testified falsely before the grand jury that Plaintiffs stole her car and held it for ransom to initiate and continue the Plaintiffs malicious prosecution.

396.   Defendant Diane Vines + WALTER VINES (JE) testified falsely before the grand jury that Plaintiffs damaged her car to generate future repairs to initiate and continue the Plaintiffs malicious prosecution.


THE WARRANTLESS BREAK-IN AT 496 WILLOWBROOK ROAD

397.   At 8pm on the evening of March 19, 2002, NYPD Detective Georgette Romagnano and numerous armed detectives and unnamed Assistant District Attorneys raided the plaintiffs' residence and home office at 496 Willowbrook Road in Staten Island without a

search warrant or probable cause, reasonable cause, or arguable probable cause.

398.    85-year-old Virginia Fileccia was and still is the title owner of the residential home at 496 Willowbrook Road in Staten Island.

399.    Virginia Fileccia was held captive during the home invasion and did not consent to the warrantless search and seizure.  The prosecutors and NYPD police officers did not have an arrest warrant for Virginia Fileccia.

400.    There were no exigent circumstances.

401.    Eyewitness testimony reveals Detective Romagnano led the warrantless home invasion and demanded cash and bankbooks from the homeowner and occupants.

402.    Eyewitness testimony reveals Detective Romagnano yelled "BINGO" during the armed robbery when she located the Plaintiffs' legitimate savings account passbooks that were kept in a closed home office desk drawer.

403.    Eyewitness testimony reveals Detective Romagnano failed and refused to provide the homeowner and eyewitnesses with a search warrant despite their repeated requests.

404.    Eyewitness testimony reveals that one of the NYPD detectives drew his firearm on Plaintiff Richard Fileccia who demanded to see a search warrant.

405.    Detective Romagnano, the NYPD armed detectives, and unnamed Assistant District Attorneys burglarized the Plaintiffs' home and seized property, paper and effects without probable cause, reasonable cause or arguable probable cause.  See NYPD Property Clerk Invoice Nos. L044000, L044001, L044002 dated March 20, 2002.

406.    More than seventeen thousand (17,000) Bates-stamped exculpatory documents were seized by the NYC Police Department during the break in—denominated "The Stolen Fileccia Records."

407. Notwithstanding Virginia Fileccia's repeated requests, Detective Romagnano failed and refused to provide the homeowner and eyewitnesses with an inventory of the property that was forcibly removed from the premises.

408. Detective Romagnano threatened to arrest an eyewitness who published her intention to take photographs and or video of the Plaintiffs' home office as the armed detectives were looting it.

409. Detective Romagnano, NYPD armed detectives and unnamed ADAs knew that their conduct—a warrantless search and seizure—was not objectively reasonable and was a violation of the Plaintiffs' clearly established Fourth Amendment constitutional right against unreasonable searches and seizures.

410. The unnamed Assistant District Attorneys who took part in the warrantless search and seizure were supervising and giving legal advice and instruction to the detectives in acquiring evidence which might be used in a prosecution and were not acting in his or her advocacy capacity. The ADAs were acting in an investigatory capacity.

Supreme Court Unseals Original Search Warrant and
Confirms Warrantless Search and Seizure of Plaintiffs'
Residence and Home Office.

411. During the criminal proceedings, ADA Varriale fraudulently claimed that Detective Romagnano's warrantless search and seizure (armed robbery) was due to a typographical error on the date of a purportedly valid search warrant that was allegedly obtained on March 15, 2002.

412. However, on May 19, 2006, in open Court, Supreme Court Judge Steven Rooney unsealed the original search warrant for the Plaintiffs' residence at 496 Willowbrook Road and confirmed that it was signed by Criminal Court Judge Alan Meyer on February

25, 2002 at 9:15am, and <u>expired</u> well before the March 19, 2002 break-in at the Plaintiffs' residence and home office.   The following is a reduced scanned image of the expired search warrant.

---

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF RICHMOND:    CRIMINAL TERM**

**PRESENT:**

HONORABLE _____
ISSUING JUSTICE

## SEARCH WARRANT

**TO ANY POLICE OFFICER OF THE NEW YORK CITY POLICE DEPARTMENT:**

1.    YOU ARE HEREBY AUTHORIZED and DIRECTED to search for and to seize the following property:

Evidence of enterprise corruption, conspiracy, scheme to defraud, petit larceny, grand larceny; money laundering, coercion, criminal possession of stolen property, falsifying business records, filing a false instrument, attorney misconduct, evidence of said crimes, evidence of a proprietary interest in, and use of, 496 Willowbrook Road, computers, automobiles, bank records of Robert Fileccia, Richard Fileccia, and CPA Motor, answering machines, business records relating to CPA Motor, Members Only Auto, On The Job Auto, and VIP Auto, legal documents and records relating to CPA Automotive, Members Only, On The Job Auto, and VIP Auto, and United States currency.

2.    YOU ARE HEREBY AUTHORIZED and DIRECTED to search the

Residence located at 496 Willowbrook Road, Staten Island, New York, located between Auburn Avenue and Denton Place.

3.    YOU ARE HEREBY AUTHORIZED and DIRECTED to search any and all persons located in the above said premises.

4.    This Warrant must be executed between the hours of 6:00 AM and 9:00 PM.

5.    This warrant must be executed not more than ten (10) days from the date of its issuance and any property seized pursuant hereto shall be returned and delivered to the Court without unnecessary delay.

Dated: February 25, 2002
Time: 9:3 A.M.
Staten Island, New York

_____
JUSTICE OF THE SUPREME COURT

---

Search Warrant Log Confirms Warrantless Search and

Seizure.

413. On May 19, 2006, Judge Rooney ordered the unsealing of the search warrant log kept by the Clerk of the Richmond County Supreme Court, Criminal Term, which revealed the existence of both an expired search warrant dated February 25, 2002 <u>and</u> a search warrant affidavit dated February 25, 2002. Prosecutors, Supreme Court Judges and Court personnel have not opposed this prima facie evidence and continue to secret Detective Romagnano's February 25, 2002 sworn affidavit in support of the expired search warrant.

414. Consistent with New York Criminal Procedure Law §690.30, the February 25, 2002 search warrant required that it was to be executed within ten days from issuance. The search and seizure of the Plaintiffs' residence and home office was not conducted until March 19, 2002, well beyond the ten-day limit. Therefore, the March 19, 2002 search and seizure was warrantless. See <u>People v. Jacobwitz</u>, 89 A.D.2d 625, 425 N.Y.2d 679 (2nd Dep't 1982) (property suppressed where warrant was executed 17 days after its issuance).

415. Prosecutors made no attempt to controvert the unsealed prima facie evidence of the March 19, 2002 warrantless search and seizure other than falsely claiming the February 25, 2002 date on the search warrant was a "typo."

416. ADA Varriale did <u>not</u> produce an affidavit from the issuing magistrate, Judge Alan Meyer, or any other evidence in support of her frivolous "typo" argument.

417. Furthermore, the February 25, 2002 search warrant was issued without probable cause, reasonable cause, or arguable probable cause. The only affidavit in support of the application for the February 25, 2002 search warrant that ADA Varriale produced in discovery is dated March 15, 2002. As that affidavit post-dates the February 25, 2002

search warrant by 18 days, Judge Meyer could not have relied upon it, and since no other affidavit had been produced during the proceedings, there was no showing of probable cause for the issuance of the February 25, 2002 warrant.

## ADA FREY'S ILLEGAL ENTRY OPERATION

418. ADA Frey prepared a fraudulent affidavit in support of a search warrant containing more than two hundred (200) false statements and material omissions as a means to break into Plaintiffs' home to steal their money and property.

419. During discovery, ADA Frey gave the Plaintiffs a redacted copy of the 27-page affidavit that is signed by Detective Georgette Romagnano in support of her application for a search warrant for 496 Willowbrook Road in Staten Island, which is dated March 15, 2002. (It bears repeating; the unsealed original search warrant for 496 Willowbrook Road is dated February 25, 2002, was <u>expired</u> at the time it was executed and was <u>not</u> accompanied by an affidavit in support.)

420. Upon inspection of the March 15, 2002 affidavit, the Plaintiffs and our investigators uncovered evidence of more than two hundred (200) documented false statements and material omissions. I respectfully incorporate by reference the Plaintiffs' February 17, 2006 Frank's Suppression Motion that is 100-pages long with 43 exhibits (236 pages), and 11-page reply affirmation dated April 17, 2006.

421. The Plaintiffs also uncovered evidence that ADA Frey—not Detective Romagano—is the author of the fraudulent affidavit. For example, although the opening paragraphs of the affidavit state that Det. Romagnano personally interviewed all of the prosecution witnesses; it was determined that many of them were actually interviewed by ADA Frey and <u>not</u> Det. Romagnano.

| | |
|---|---|
| Private Investigator: | You just walked into a Grand Jury? How were you originally contacted? |
| Mr. Archer: | Subpoenaed. |
| Private Investigator: | You were subpoenaed? |
| Mr. Archer: | Yeah. By the district attorney. |
| Private Investigator: | By the District attorney? |
| Mr. Archer: | Yeah ... |
| Private Investigator: | Okay. What I wanted to ask you is did you talk to anybody prior to that Grand Jury? I know you said that you were subpoenaed you went to the Grand Jury and I thank you for doing that but were you interviewed by anybody prior to you actually going to the Grand Jury and testifying? |
| Mr. Archer: | No. From who? Interviewed by who? |
| Private Investigator: | I don't know. The DA or any – okay. And – |
| Mr. Archer: | When you say "interviewed" the only interview we had was the Grand Jury when the DA explained what would happen in the Grand Jury room. |

422.   Page 8 of the affidavit also states, "Mr. Fileccia was arrested for unauthorized use of a motor vehicle, **but my office ... deferred prosecution**." Since the NYPD, where Det. Romagnano is employed, cannot make prosecution decisions, ADA Frey is undoubtedly the author of the fraudulent affidavit.

423.   As a result of the foregoing, the search warrant for 496 Willowbrook Road, regardless of the date that appears thereon, was obtained without probable or reasonable cause that the Plaintiff committed any crime in violation of my Fourth Amendment constitutional right against unwarranted searches and seizures.

424.   ADA Frey's fabrication of evidence in the affidavit took place during the investigatory stage of the criminal proceedings, well underline before the Plaintiffs' indictment on March 19, 2002. ADA Frey gave legal advice and instruction to Det. Romagnano in acquiring evidence for the Plaintiffs' unlawful seizure and was not acting in a judicial or advocacy capacity.

425.   Defendants ADA Frey and Detective Romagnano knew that their conduct—fabricating evidence and obtaining a search warrant without probable cause—was <u>not</u> objectively reasonable and was a violation of the Plaintiffs' clearly established Fourth Amendment constitutional right against unreasonable searches and seizures.

## CONTAINMENT BY THE USE OF ANY MEANS NECESSARY

426.   ADA Frey was given full authority to use whatever means necessary to shut down the black operation and tie it off, including:

   a)  stealing the Plaintiffs' United States Mail;

   b)  destroying the Plaintiffs' United States Mail;

   c)  full envelope intrusion;

   d)  mail manipulation;

   e)  destroying <u>all</u> exculpatory evidence including 17 automobiles and Small Claims Court Records;

   f)  misusing Orders of Protection to destroy exculpatory evidence;

   g)  targeting/arresting the Plaintiffs, their investigators, experts, and lawyers;

   h)  and instructing co-conspirators to withhold and destroy exculpatory evidence.

### ADA FREY'S MAIL THEFT RING

427.   Frey simultaneously launched numerous emergency containment measures including a clandestine Mail Theft Operation that he had in place <u>before</u> the Plaintiffs' indictment.

428.   Investigations reveal that in or around December 2001, ADA Frey, his paralegal Elizabeth Watts, prosecution witnesses Steven and Lori Orlando, and operatives within

the United States Postal Service conspired and acted in concert to steal the Plaintiffs' mail.

429.   ADA Frey used his mail theft ring to fabricate the Plaintiffs' Tax Indictment. See COMPLAINT filed in United States District Court Eastern District of New York on February 5, 2010, Robert J. Fileccia v. The City of New York et al., Case No. 1:2010cv00530.

430.   ADA Frey also used his mail theft ring to conceal his fabricated Car Indictment and protect his operatives from detection and apprehension. He stole DMV Hearing Notices *before* they were delivered to the Plaintiffs' homes and office so that Robert and Richard Fileccia would fail to appear for trial and lose by default. In this way, ADA Frey would scuttle the DMV hearings, protect his witnesses from cross examination, and conceal his fabrication of the 309-Count Car Indictment. As explained above, the prosecution witnesses in the Car Indictment and the State's witnesses in the DMV hearings are the same co-conspirators who plotted with ADA Frey to initiate and continue the Plaintiffs' wrongful seizure.

Preliminary Facts

431.   The following preliminary facts are needed as the background to ADA Frey's criminal activity and fabrication of the 309-Count Car Indictment during the investigatory (plotting) stage of the criminal proceeding.

432.   In 1990, the Plaintiffs built a new commercial building on vacant land. Plaintiff Robert J. Fileccia was a real estate lawyer who occupied the 2nd floor of the new building at 1276 Castleton Avenue in Staten Island, and Plaintiff Richard Fileccia occupied the 1st Floor with his automobile repair facility known as CPA Motor Cars Ltd.



433.    Ten years later, in July of 2000, the Plaintiffs began a major alteration and converted the building into professional offices.  As the work progressed, the Plaintiffs met Steven Orlando and Lori Orlando who agreed to purchase the building.  On July 18, 2001, the closing took place and title of the premises transferred to Steven and Lori Orlando who owed Plaintiffs money on the renovations that were substantially complete.

434.    The Plaintiffs filed several mail forwarding orders in the United States Postal Service on or about November 10, 2001 that instructed the USPS to send Plaintiffs' mail to their home address located at 496 Willowbrook Road in Staten Island.  The United States Postal Service confirmed their receipt of the Plaintiffs' mail forwarding orders that are Bates-stamped 500561, 500563, 500565, 500567 and 500569.  See paragraph 1(h) above.

435.    On or about September 11, 2001, Steven and Lori Orlando breached their agreement to make timely payments for the renovations.  As negotiations between the parties collapsed, the Plaintiffs noticed that United States mail addressed to them at 1276 Castleton Avenue began to disappear.  Plaintiff Richard Fileccia notified the United States Postal Service of the suspected stolen mail in a series of hand written letters Bates-stamped 500578, 500579, 500580, and 500596.

436.    On February 19, 2002, the Plaintiffs sued Steven Orlando and Lori Orlando for breach of

contract in NYC Civil Court, Staten Island.

### ADA Frey Recruits Steven Orlando, Lori Orlando and Data Comm Consulting Group Inc. to Steal the Plaintiffs' Mail

437. Rosario material in Robert J. Fileccia's criminal tax trial reveals that the Richmond County District Attorney's Office first recruited Steven Orlando and Lori Orlando to steal the Plaintiffs' mail for them in or around December of 2001.

438. Recorded interviews of Lori Orlando on January 5, 2006 and January 13, 2006 reveal that ADA Frey ordered her to take all United States mail addressed to the Plaintiffs' 1276 Castleton Avenue office address and mail it directly to him or Paralegal Watts at the Richmond County District Attorney's Office.

439. ADA Frey, Paralegal Watts, Steven and Lori Orlando conspired and acted in concert to steal the Plaintiffs' mail knowing that they had several current mail forwarding orders in place as of November 10, 2001.

440. During the recorded interview, Lori Orlando positively identified ADA Frey and Paralegal Watts as the two suspects who directed her to steal the Plaintiffs' United States Mail and produced ADA Frey's business card to corroborate her testimony.

441. ADA Frey, Paralegal Watts, Steven and Lori Orlando knew or reasonably should have known that it is a felony to intercept, steal, delay or destroy United States Mail. See 18 USCS §1701: Obstruction of mails generally, 18 USCS §1702: Obstruction of correspondence, 18 USCS §1708: Theft or receipt of stolen mail matter generally, and 18 USCS §1341: Frauds and swindles.

442. In response to ADA Frey's ongoing mail theft operation, the Plaintiffs retained the services of additional licensed private investigators that are former United States Postal

Inspectors and consulted with an active law enforcement officer.

443. On numerous dates and discreet locations, the Plaintiffs and their investigators interviewed United States Letter Carrier Gabriel Cruz—the mailman that was assigned to delivery route 6 in Staten Island where the Plaintiffs owned and operated an auto repair shop and law office. Gabriel Cruz informed the Plaintiffs that shortly after they sold their commercial building to Steven and Lori Orlando and vacated the premises in October 2001, Lori Orlando approached him and adamantly demanded all US mail addressed to Robert and Richard Fileccia. She falsely claimed that the Plaintiffs were still occupants at that address and told Cruz to disregard their mail forwarding orders.

444. On January 18, 2006, during a recorded interview with Plaintiffs' licensed private investigator, Lori Orlando confessed that ADA Frey instructed her to send the Plaintiffs' stolen mail to him and Paralegal Watts. Lori Orlando admitted that: (a) she knew the mail she was sending ADA Frey was not her mail; (b) she knew the plaintiffs had current mail forwarding orders in place; (c) she used Federal Express, an interstate courier, to send the Plaintiffs' stolen mail to ADA Frey; (d) she paid for the Federal Express packages; and (e) did all the foregoing without the Plaintiffs' knowledge or consent.

445. United States Letter Carrier Gabriel Cruz was present for most of Lori Orlando's interview.

446. On January 18, 2006, during a second recorded interview with the Plaintiffs' investigator, Lori Orlando made a second positive identification of ADA Frey and Paralegal Watts as the two suspects who told her to steal the Plaintiffs' United States Mail and produced ADA Frey's business card to corroborate her testimony.

447. The Plaintiffs' private investigator gave Lori Orlando an affidavit to sign to memorialize

ADA Frey's theft of the Plaintiffs' mail.

448. Both Lori Orlando and Steven Orlando admitted to having called the District Attorney's Office immediately before their second interview with the Plaintiffs' investigator.

449. Within minutes of Steven and Lori Orlando's second interview with the Plaintiffs' investigator, US Postal Inspector Richard Wolfe called Letter Carrier Gabriel Cruz on the telephone and asked him myriad questions for the purposes of intelligence gathering and damage control for the District Attorney's Office:

| Inspector Wolfe: | And now something else happened today, you know. So people are inquiring about that. |
| Letter Carrier Cruz: | Right. |
| Inspector Wolfe: | The DA's Office and stuff. So, they're asking me and yeah I know something but I don't know exactly what's going on. |

450. Inspector Wolfe also told Cruz that the District Attorney's Office was inquiring "if the private investigator tried to get Steven and Lori Orlando to sign any forms or something?"

451. Inspector Wolfe completed his interrogation of the letter carrier by saying, "Alright, if I need anything else, I'll call you right back" indicating that he was going to have a debriefing with ADA Frey and may be receiving further instructions.

452. On February 6, 2007, Steven Orlando testified under oath in Richmond County Supreme Court during Plaintiff Robert J. Fileccia's criminal tax trial. Steven Orlando confessed during cross examination that he had been sending the Plaintiff's mail to ADA Frey all along at which time ADA Varriale warned, **"I'm afraid we are going to get to the point where Orlando is going to need to be advised of his Miranda warnings."** Supreme Court Judge Robert Collini asked, "… is there any debate as to the fact that he sent mail [to David Frey]? ADA Varriale replied, "No, he sent it." [Tr. 2/6/07 at 239.]

Certified Federal Express Records Implicate ADA Frey in a
Mail Theft Ring

453. In July, August, and November of 2006, Plaintiff Robert J. Fileccia, Esq. lawfully obtained copies of Steven Orlando, Lori Orlando, and Data Comm Consulting Group Inc.'s Federal Express Account No. 2268-xxxx-x including United States Air Bills, package details, tracking numbers, delivery information, and scanned delivery signatures.

454. Certified Federal Express records provided by the Federal Express Law Department Custodian of Records revealed overwhelming evidence of ADA Frey's Mail Theft Ring. The certified records list numerous US Air Bills and Packages that Steven Orlando, Lori Orlando, and Data Comm sent to ADA Frey and Paralegal Watts. The Federal Express packages contained the Plaintiffs' stolen mail including stolen certified mail, first class mail, priority mail, and other accountable mail that is addressed to the Plaintiffs and their former businesses.

455. The certified Federal Express Air Bills indicate ADA Frey's mail theft ring began stealing the Plaintiffs' mail *before* grand juries were convened in both the Car Indictment and Tax Indictment.

456. Immediately below is a Federal Express Air Bill from Lori Orlando to ADA Frey dated June 2, 2003 that contained stolen mail that is postmarked before the Tax Indictment. The June 2, 2003 Air Bill is also prima facie evidence that Lori Orlando sent additional stolen mail to ADA Frey during the investigatory (plotting) stage of the Tax Indictment long *before* the prosecutors' presentation to a grand jury.



457.   Certified Federal Express signed delivery records indicate the Richmond County District Attorney's Office received the stolen mail on June 10, 2003.



ADA Frey Steals Plaintiffs' Sting Mail

458.   To infiltrate ADA Frey's Mail Theft Ring and prove that the Federal Express Air Bills

106

contained stolen mail, on December 7, 2005, investigators sent *sting mail* addressed to the Plaintiff Robert Fileccia's former law office address.

459.  Certified Federal Express Air Bill No. 8455-3049-6620 reveals that Steven Orlando (and Data Comm Consulting Group Inc.) intercepted and stole the sting mail that is postmarked December 8, 2005, delayed it for three weeks until December 29, 2005, and then mailed it by Federal Express courier to Paralegal Watts in the Richmond County District Attorney's Office at 130 Stuyvesant Place, Staten Island, New York.



460.  Certified Federal Express signed delivery records indicate the Richmond County District Attorney's Office received the stolen sting mail on January 3, 2006, the first business day after the New Year holiday.

```
┌─────────────────────────────────────────┐
│  DELIVERY INFORMATION/SPOD Letter:        │
│  ┌─────────────┬──────────────────────┐  │
│  │             │ J.FIGUROREA          │  │
│  │ Signed For By:                      │  │
│  │             │                      │  │
│  ├─────────────┼──────────────────────┤  │
│  │ Delivered to:│ 130 STUYVESANT PL ST │  │
│  ├─────────────┴──────────────────────┤  │
│  │ Delivery Date: 01/03/2006           │  │
│  ├─────────────────────────────────────┤  │
│  │ Delivery Time: 10:05                │  │
│  └─────────────────────────────────────┘  │
└─────────────────────────────────────────┘
```

461.  United States Postal Service records and other evidence reveal that on January 3, 2006, ADA Frey immediately wrote "*Moved 496 Willowbrook Road*" on the outside of each of the sting mail envelopes and then dumped the sting mail back into the outgoing USPS mail attempting to avoid detection and apprehension for his criminal activity.

462.  ADA Frey utilized the same artifice to defraud on other stolen mail that he had been hiding for as long as one hundred and thirty eight (138) days calculated from the postmark on the stolen envelopes.

463.  The Plaintiffs' private investigators lawfully recovered the stolen sting mail and other misappropriated mail as evidence for law enforcement authorities.

ADA Frey's Lulling Letters

464.  Throughout the Plaintiffs' investigation, ADA Frey sent the Plaintiffs a series of five (5) lulling letters that were designed to lull them into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make his detection and apprehension less likely than if no mailings had taken place.

465.  ADA Frey used his lulling letters in furtherance of his fraudulent scheme and to facilitate concealment of it.

466.  ADA Frey also designed his lulling letters to implicate his operatives Steven and Lori

Orlando for the mail stolen from 1276 Castleton Avenue. In other words, ADA Frey was framing his own operatives as scapegoats for the crimes they orchestrated and committed in concert with him and was preparing to throw the Orlandos 'under the bus' when they proved no longer useful to him.

467.    For example, on January 18, 2005, ADA Frey admitted receiving the Plaintiffs' stolen mail, intentionally implicated his operatives Steven and Lori Orlando, and arrogantly proclaimed that he will continue to steal and withhold the Plaintiffs' mail *regardless* of anything I say or do:

> ADA Frey:    "I just received more mail addressed to you and your brother at 1276 Castleton Avenue. ... Whenever the current owner of 1276 Castleton Avenue [Steven and Lori Orlando] forwards mail to me, you can be assured that I will always contact the most recent retained attorney to ask him where he wants this mail sent, regardless of any requests by you."

ADA Frey Steals DMV Hearing Notices that were Mailed
to the Plaintiffs' Former Business Address

468.    An examination of the recovered stolen mail reveals that ADA Frey, Steven Orlando, Lori Orlando, and Data Comm stole numerous DMV Hearing Notices that were sent to the Plaintiffs' former business address at 1276 Castleton Avenue in Staten Island.

469.    Many of the DMV notices were sent to the Plaintiffs by certified mail.

470.    DMV Inspector George Filippides, as part of ADA Frey's mail theft scheme, sent "Notices of Hearing" to the Plaintiffs' Castleton Avenue address, knowing that Richard and Robert Fileccia already sold the building and vacated the premises. Investigations reveal that Filippides sent the Plaintiffs' lulling letters in furtherance of the scheme. See Fabrication of Car Indictment below.

471.    The recovered stolen mail indicates that ADA Frey stole the DMV hearing notices *before*

they were delivered to the Plaintiffs so that Richard and Robert Fileccia would fail to appear for trial and lose by default.  In this way, ADA Frey would scuttle the DMV hearings, protect his witnesses from cross examination, and conceal his fabrication of the 309-Count Car Indictment.

472.   The prosecution witnesses in the Car Indictment and the State's witnesses in the DMV hearings are the same co-conspirators who plotted with ADA Frey to initiate and continue the Plaintiffs' wrongful seizure.

> ADA Frey's Operatives Steal DMV Notices of Hearing and DOF Tax Deficiency Notices that were Mailed to the Plaintiffs' Home

473.   This section pertains to ADA Frey's stealing United States mail that is addressed to the Plaintiffs' home at 496 Willowbrook Road in Staten Island, New York 10314.

474.   On or about December 5, 2003, during litigation of a related Article 78 action in Albany County Supreme Court (Index No. 6291/03), Plaintiffs uncovered several pieces of stolen certified mail that are correctly addressed to their home at 496 Willowbrook Road in Staten Island—but which were never received.

475.   Investigations reveal that the Plaintiffs did not receive the certified mail because they were intercepted before they were delivered—not by Steven or Lori Orlando—but by another DA operative *inside* the main United States Post Office located at 550 Manor Road in Staten Island.

476.   The DMV envelopes indicate they are correctly addressed to the Plaintiffs' home, but were intercepted and marked "Moved Left No Address" and "Return To Sender" by ADA Frey's operatives inside the Post Office at 550 Manor Road in Staten Island.



477. United States Postal Inspector Richard Wolfe maintained a satellite office at 550 Manor Road in Staten Island.

478. As a result of the foregoing, the Plaintiffs' private detectives widened the scope of their investigation. On November 12, 2008, pursuant to a Freedom of Information Law request, the Plaintiffs obtained certified copies of eight (8) tax notices that the New York State Department of Taxation and Finance sent to their home address at 496 Willowbrook Road in Staten Island.

479. Four of the tax notices were sent to the Plaintiffs by certified mail.

480. The Plaintiffs never received any of the eight (8) tax notices even though all of them were correctly addressed to 496 Willowbrook Road, Staten Island, NY 10314.

481. The Plaintiffs' investigators performed a thorough investigation on the United States Postal Services "track and confirm" system and uncovered incontrovertible evidence that ADA Frey's operatives inside the United States Postal Service had sabotaged the USPS record keeping system and manipulated its entries to avoid detection and apprehension. The sabotaged USPS track and confirm system reflects the following phony delivery

addresses for the stolen certified mail:

(a) Briarcliff Manor, New York 10510;

(b) Bayside, New York 11361;

(c) Albany, New York 12227; and

(d) "There is no record of this item."

482.   It is factually impossible for the correctly addressed envelopes to be misdelivered to four different locations scattered throughout the State of New York.

483.   Furthermore, the eight tax notices request payment of taxes due for the following tax periods: (a) Notice of Determination, 6/1/01-8/31/01; (b) Notice and Demand for Payment of Tax Due, 6/1/01-8/31/01; (c) Notice of Determination, 9/1/01-11/30/01; (d) Notice and Demand for Payment of Tax Due, 9/1/01-11/30/01; (e) Notice of Determination, 12/1/01-2/28/02; (f) Notice and Demand for Payment of Tax Due, 12/1/01-2/28/02; (g) Notice of Determination, 3/1/02-5/31/02; (h) Notice and Demand for Payment of Tax Due, 3/1/02-5/31/02.

484.   Count 5 of the Tax Indictment alleges "willful failure" to file tax returns for the exact same time periods set forth in the stolen tax notices listed above.

485.   Therefore, the theft of the foregoing tax notices enabled ADA Frey to fabricate Count 5 of the Tax Indictment without probable or reasonable cause long before presentation of the fraudulent evidence to a grand jury and well within the plotting (investigatory) stage of the criminal proceedings.

### ADA Frey Targets Letter Carrier Gabriel Cruz

486.   On July 14, 2005, Plaintiff Richard Fileccia had a recorded telephone conversation with criminal defense lawyer Mark M. Baker, who briefly represented him in motion practice.

During the telephone conversation, Richard informed Baker that Robert J. Fileccia, Esq. was going to initiate a federal mail fraud investigation against ADA Frey.

487. Within hours of this conversation, the United States Postal Service issued a "Notice of Removal" dated July 14, 2005 against Letter Carrier Gabriel Cruz that falsely accused the innocent mailman of "Delaying First Class Mail" on his Castleton Avenue route where the Plaintiffs' former office building was located.

488. ADA Frey and his operatives were targeting Gabriel Cruz to be the 'fall guy' for their criminal activity. However, the July 14 Notice of Removal was not an alibi for the stolen tax notices that were addressed to the Plaintiffs' home at 496 Willowbrook Road in Staten Island, because the July 14 Notice of Removal pertained only to mail from the Castleton Avenue route.

489. As a result, on October 18, 2005, someone inside the Postal Service *planted* 280 pieces of outgoing US mail in the back of Gabriel Cruz's delivery truck while it was awaiting unscheduled maintenance at the main United States Postal facility at 550 Manor Road in Staten Island.

490. United States Postal Inspector Richard Wolfe maintained a satellite office at 550 Manor Road in Staten Island.

491. Gabriel Cruz was again falsely charged with delaying first class mail.

492. Unbeknownst to ADA Frey or his operatives, Cruz lawfully obtained photographs of the planted mail which revealed that all of their return addresses were from the Willowbrook Road delivery route, where the Plaintiffs reside, and not from the Castleton Avenue delivery route where Cruz was assigned. Therefore, since it was impossible for Gabriel Cruz to have access to mail from another route, he could not be guilty of leaving it in his

delivery truck or of the crimes he was falsely accused of.

493.    On March 6, 2006, Gabriel Cruz was found innocent of all charges.

494.    On June 13, 2006, Gabriel Cruz called United States Postal Inspector Richard Wolfe located at 550 Manor Road in Staten Island—the same post office where mail was planted in Cruz's delivery truck—and told Wolfe that he wanted to file a criminal complaint against ADA Frey for stealing the Plaintiff's mail.

495.    During the recorded telephone conversation, Inspector Wolfe informed Gabriel Cruz that he will not investigate the District Attorney's Office even though it is a crime for ADA Frey and Lori Orlando to have misappropriated the Plaintiff's mail.  When Cruz asked Inspector Wolfe whether he should report ADA Frey's mail crimes to federal law enforcement authorities, Wolfe warned the letter carrier that he was wasting his time because the United States Attorney's Office was going to *"kick it back to him"* and he "already" determined Cruz's complaint to be unfounded.  Inspector Wolfe indicated that he was going to obstruct justice and bury Cruz's complaint regardless of what Cruz said or did.

496.    On August 10, 2006, Gabriel Cruz obtained documentary evidence that Inspector Richard Wolfe unlawfully sent a copy of the letter carrier's mail fraud complaint to the District Attorney's Office, apparently warning ADA Frey of an impending federal investigation.

497.    The record evidence indicates that Inspector Richard Wolfe performed no investigation into Cruz's allegations against ADA Frey but instead made overt efforts to conceal Frey's criminal activity (Misprision of Felony).

United States Postal Service Implicates Supreme Court
Justice Leonard Rienzi

114

498.  Being unable to frame the letter carrier for ADA Frey's ongoing mail fraud scheme, on June 21, 2006, USPS Manager Sandra Stern issued a "Notice of Removal" against Gabriel Cruz for his purportedly failing to appear for a fitness for duty medical examination that was intended to discredit him as a fact witness.

499.  Gabriel Cruz opposed the removal with independent medical evaluations that indicated he was "fit for duty" and was simply asking for a change in his delivery route, away from the dangerous routes where the Plaintiffs' mail was being stolen.

500.  Gabriel Cruz's request for a change in his delivery route was "DENIED." [Emphasis in the original.]

501.  On June 26, 2006, Letter Carrier Cruz called Union Representative Paul Alexander to discuss his most recent Notice of Removal and asked whether the union president could help him get assigned to another delivery route.

502.  During this recorded telephone conversation, Paul Alexander informed Cruz that USPS Human Resources Manager David Rudy sent Supreme Court Justice Leonard Rienzi— who was presiding over the Plaintiffs' criminal indictments—an illegal ex parte written communication concerning Gabriel Cruz's allegations against ADA Frey.

503.  Judge Rienzi did not disclose his unlawful ex parte communication to the Plaintiffs or their defense attorneys.  Instead, he issued falsified decisions denying the Plaintiffs' motions to dismiss the fabricated indictments including Judge Rienzi's failure to even consider a 2-page warrantless search and seizure suppression motion that should have ended The Tax Indictment. See "The Plumbers Team" below.

504.  On July 31, 2006, Plaintiffs' private investigators uncovered reliable evidence indicating that Union Representative Paul Alexander unlawfully and surreptitiously removed

Gabriel Cruz's independent medical evaluations from his personnel file, which resulted in the mailman being unable to defend himself against the fraudulent "fitness for duty" charges. Paul Alexander framed Cruz for the frivolous charges and conspired with ADA Frey or his operative(s) to have him terminated from the Postal Service.

505. On August 4, 2006, Letter Carrier Cruz was unjustly fired from the United States Postal Service in retaliation for (a) reporting ADA Frey's criminal activity and (b) for his being a witness against the Richmond County District Attorney's Office in a foreseeable federal investigation concerning their theft of United States mail.

506. On October 2, 2006, the Plaintiffs' investigators obtained a written statement from a USPS employee who saw USPS Manager Sandra Stern unlawfully searching Gabriel Cruz's post office box <u>without</u> a search warrant.

#### The Postal Inspection Service Threatens to Arrest Gabriel Cruz to Silence Him.

507. Foreseeing a federal investigation into ADA Frey's theft of the Plaintiffs' mail, on November 29, 2006, United States Postal Inspector Steven Barrientof called Gabriel Cruz under the false pretense of conducting a criminal investigation. The recorded telephone conversation reveals Inspector Barrientof was knowingly and intentionally tampering with a witness, in violation of 18 USCS §1512, §1513, and §3.

508. Inspector Barrientof told Cruz that he was a federal agent authorized to arrest people, execute search warrants, that he had a photograph of Gabriel Cruz and could easily find and arrest him. He warned Cruz in no uncertain terms that if he were to appear at a future arbitration, whether Department of Labor hearing or otherwise, it would be management's word against his, and if corroborated, would result in Cruz's immediate

arrest. Inspector Barrientof said, "Just be careful, if you are at an arbitration … you can be arrested." He also professed that if someone made a complaint to the New York Police Department about Gabriel Cruz, he would have *already* been arrested because the NYPD makes arrests upon baseless allegations all the time.

509.  Inspector Barrientof then asked Gabriel Cruz a series of leading questions which led Plaintiff Robert J. Fileccia, Esq. to believe that he was tape recording the conversation and attempting to create a false self serving record to discredit Cruz as a fact witness against ADA Frey.  Without probable or reasonable cause, Barrientof falsely accused Cruz of being "paranoid" and at the "top of his very nervous list."  Inspector Barrientof asked and answered his own questions, such as "Are you OK?" … "You sure?" … while at the same time suggesting that Cruz needed to "talk to somebody."  Finally, without reasonable or probable cause, Inspector Barrientoff repeatedly voiced his concern that Cruz "was going to hurt himself," which implied that harm would come to Cruz if he were to testify against ADA Frey or his operatives.

510.  As a result of the foregoing, Gabriel Cruz was denied unemployment insurance, made to be homeless and has suffered unimaginable financial and personal ruin.

511.  The foregoing incontrovertible evidence indicates that ADA Frey's Mail Theft Ring has compromised the integrity of the local United States Postal Service and continues to be a clear and present danger to the People of Staten Island and that of the United States. Furthermore, the record evidence indicates the Richmond County District Attorney's Office is engaged in racketeering activity, as defined by Section 1961 of the Racketeer Influenced and Corrupt Organizations Act, and is considered a continuing criminal enterprise.

## The Plaintiffs' Ongoing Mail Theft Investigation

512.    In a recorded telephone conversation on July 10, 2009, DOF lawyer David Atik admitted that he has been unlawfully withholding more than 3 inches of tax documents from the Plaintiffs—including DOF envelopes that were returned to sender—and saw about 900 pages of related tax records in DOF auditor Michael Schenk's possession, the chief auditor who conspired to initiate and continue the Plaintiffs' malicious prosecution in the Tax Indictment.    See COMPLAINT filed in United States District Court Eastern District of New York on February 5, 2010, Robert J. Fileccia v. The City of New York et al., Case No. 1:2010cv00530.

513.    Although David Atik was recorded promising to immediately surrender the Plaintiffs' stolen mail and other critically important tax records to Plaintiff Robert Fileccia, he has intentionally withheld this information in order to a) conceal ADA Frey's criminal activity (misprision of felony) and b) to violate the Plaintiffs' constitutional right of access to courts.

514.    The Plaintiffs and their licensed detectives maintain an ongoing investigation into ADA Frey's Mail Theft Ring and the District Attorney's continuing criminal enterprise.    As a result, the Plaintiffs respectfully reserve the right, pursuant to the Federal Rules of Civil Procedure and the United States Constitution, to amend this complaint as of right, and when necessary based upon newly discovered evidence.

> By Fabricating Evidence, ADA Frey, Paralegal Watts,
> Steven Orlando, Lori Orlando, and Data Comm Consulting
> Group Inc. Initiated and or Continued the Plaintiffs'
> Wrongful Seizure In Violation of the Plaintiffs' Clearly
> Established Constitutional Rights

515.  By stealing the Plaintiffs' mail, ADA Frey, Paralegal Watts, Steven Orlando, Lori Orlando, and Data Comm Consulting Group Inc. fabricated evidence that initiated and or continued the Plaintiffs' unlawful seizure without probable or reasonable cause in violation of (a) the Plaintiffs' 4th Amendment Constitutional right not to be seized without probable or reasonable cause; (b) the Plaintiffs' 4th and 14th Amendment Constitutional Right not to be maliciously prosecuted; (c) the Plaintiffs' 6th Amendment Constitutional right to a fair trial; and (d) the Plaintiffs' constitutional right not to be deprived of liberty as a result of fabrication of evidence by a government officer acting in an investigatory capacity (and or their co-conspirators), at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty.

### Lorraine Stergious Destroys Civil Court Records

516.  Either shortly before or after the March 19, 2002 arrests of Plaintiffs Richard and Robert Fileccia: exculpatory documents not presented to the Grand Jury were removed from civil court files; and audio tapes of official civil court proceedings from earlier suits Richard Fileccia had filed against nonpaying clients were destroyed.

517.  On May 1, 2003 Deputy Chief Clerk Lorraine Stergious unlawfully disposed of original civil court records immediately after the Plaintiffs requested them.

518.  Plaintiffs' Private investigators found more than 20,000 un-shredded official Court documents in garbage bags at the County Courthouse curbside containing original Grand Jury Exhibits used in the Car Indictment, No. 62/2002.

519.  The following is a photograph of the 20,000 un-shredded official Court documents that were found in garbage bags at the County Courthouse curbside.

119



520. The Civil Court's records retention schedule indicates that the Small Claims Court must retain all their records for 25 years.

521. Investigations reveal that NYC Civil Court Clerk Lorraine attempted to destroy the foregoing exculpatory records immediately after Plaintiff Richard Fileccia requested them.

522. Lorraine Stergious withheld and attempted to destroy exculpatory evidence in order to continue the Plaintiffs' malicious prosecution.

### John G. Hall and others Withhold Exculpatory Evidence

523. On December 2, 2002, Plaintiff Robert J. Fileccia, Esq. requested a copy of the Plaintiffs' bank records from SI Bank and Trust and their lawyer, John G. Hall.

524. In response, John Hall informed the Plaintiff that DA Lehr ordered him not to release the

Plaintiffs' bank account records.

525.    After the Plaintiff Robert J. Fileccia sent John Hall a number of other demands, including a memorandum of law and a criminal complaint he filed with the Office of Thrift Supervision, John Hall and SI Bank & Trust finally released the Plaintiffs' bank records on August 4, 2003.

526.    John Hall and SI Bank & Trust delayed the production of the Plaintiffs' bank records for more than eight months, and released the information after the Plaintiffs filed their omnibus motion dated June 23, 2003 to dismiss the Car Indictment.

527.    Analysis of the Plaintiffs' SI Bank & Trust records uncovered ten checks, totaling **$301,484.92**, which were generated from the legitimate sale of the Plaintiffs' commercial building on July 18, 2001.

528.    The Plaintiffs opened at least nine bank accounts with the lawful proceeds of that sale.

529.    The money was first deposited into savings and checking accounts, and then the same money was moved from the savings accounts into certificates of deposit to earn a higher rate of interest.

530.    According to the Grand Jury Exhibits in the Car Indictment, none of the ten deposited checks were seen by the Grand Jury.

531.    Investigations reveal that NYPD Detective Georgette Romagnano testified falsely as to the Plaintiff savings accounts and claimed that all of their money and bank accounts were "proceeds of crime". Detective Romagnano failed to inform the grand jury that almost all of the Plaintiffs' savings accounts were generated by the legitimate sale of their commercial building to Steven and Lori Orlando.

532.    Detective Romagnano also testified falsely in any number of two hundred additional

ways, consistent with her fraudulent affidavit in support of a search warrant for 496 Willowbrook Road. See ADA Frey's Illegal Entry Operation above.

533.   Detective Romagnano testified falsely and withheld exculpatory evidence from the grand jury to initiate and procure the Plaintiffs' seizure and malicious prosecution without probable or reasonable cause.

534.   Defendants John G. Hall, The Law Firm of Hall & Hall LLP, SI Bank & Trust, Sovereign Bank, Sovereign Bancorp, Inc., and Banco Santander withheld exculpatory evidence from the Plaintiffs to continue their malicious prosecution without probable or reasonable cause.

535.   Defendants John G. Hall, The Law Firm of Hall & Hall LLP, SI Bank & Trust, Sovereign Bank, Sovereign Bancorp, Inc., and Banco Santander conspired and acted in concert with DA Lehr to continue the Plaintiffs' malicious prosecution.

### ADA Frey Instructed Witnesses to Withhold and or Destroy Exculpatory Evidence

536.   Notwithstanding standing Court Orders to make his witnesses' automobiles available to the Plaintiffs for inspection, ADA Frey:

a)   told witnesses that it was "unnecessary" to have their cars inspected;

b)   told witnesses they can sell their automobiles;

c)   did nothing and encouraged witnesses to sell or destroy their automobiles;

d)   failed to schedule automobile inspections;

e)   abandoned his witnesses and failed to inform them of standing Court Orders;

f)   told witnesses not to cooperate with the Plaintiffs or their investigators;

g)   told witnesses to call the police if the Plaintiffs or their investigators attempted to

interview them;

h) told witnesses to instruct Plaintiffs' investigators to leave; and

i) lied to witnesses that they have an Order of Protection against "everyone" associated with the Plaintiffs.

### ADA Frey Misused Orders of Protection to Destroy Exculpatory Evidence

537. ADA Frey fraudulently obtained an Order of Protection to keep the Plaintiffs and their private investigators at bay while his witnesses and co-conspirators sold and destroyed their automobiles notwithstanding standing Court Orders to make them available to the Plaintiffs for inspection.

### ADA Frey and ADA Varriale Withheld and or Destroyed Specific Brady Material, Specific Rosario Material and Exculpatory Evidence

538. ADA Frey and ADA Karen Varriale intentionally withheld and or destroyed specific *Brady* material, specific *Rosario* material, and exculpatory evidence from the Plaintiffs, despite repeated court orders to make the evidence available. See "Summary of Specific Brady Material, Specific Rosario Requests and Exculpatory Evidence Being Concealed and/or Destroyed By Prosecutors" dated 11/7/06 in Indictment 62/2002, which the Plaintiffs respectfully incorporate by reference.

## PROSECUTORS' TARGET CRIMINAL DEFENSE LAWYERS

### Benjamin Brafman, Esq. and Mark M. Baker, Esq.

539. The Plaintiffs hired Brafman and Baker on or about January 6, 2005. The parties agreed

that Brafman and Baker would represent Richard Fileccia in both the Tax and Car Indictments, and prepare motions for <u>both</u> Plaintiffs in both pending indictments.

540. Defendants Brafman and Baker held themselves out to be tax lawyers.

541. Defendants Brafman and Baker requested and received a one hundred fifty thousand dollar ($150,000) retainer.

542. Defendant Brafman said the $150,000 retainer included "everything" for both Plaintiffs in both indictments (62/2002 and 23/2004) up to the first day of trial.

543. Defendants Brafman and Baker understood and agreed that there would be no plea bargains because the Plaintiffs were innocent of all charges. The "no plea" terms of the agreement were an indispensible and inviolate part of the Plaintiffs' contract with Brafman and Baker.

544. Defendants Brafman and Baker were warned orally and in writing that prosecutors would attempt to surreptitiously conflict out their law firm, and thereby disqualify them as fact witnesses pursuant to the witness advocate rule.

545. Investigations reveal that two weeks after being retained, on January 17, 2005, ADA Frey called Brafman's law firm and spoke to his associate Raena Selip, Esq. ADA Frey asked Raena Selip for the Plaintiffs' home address—even though he knew precisely where the plaintiffs lived—and surreptitiously tried to re-direct the Plaintiffs' stolen mail to Brafman's office. Raena Selip informed Baker of these facts.

546. Brafman and Baker knowingly and intentionally failed to inform the Plaintiffs, the Court, or law enforcement agencies about ADA Frey's conversation with Raena Selip, Esq., and or the growing evidence of ADA's mail theft ring in violation of their contractual, ethical and fiduciary responsibilities to the Plaintiffs.

547. On June 2, 2005, Brafman and Baker met with prosecutors in a closed door meeting.

548. On June 9, 2005, Brafman and Baker demanded that the Plaintiffs plead guilty to crimes they knew Robert and Richard Fileccia did not commit in violation of their contractual, ethical and fiduciary responsibilities to the Plaintiffs.

549. On June 11, 2005, Plaintiff Richard Fileccia sent Baker a certified letter requesting Raena Selip's sworn affidavit to memorialize ADA Frey's criminal activity.    Defendants Brafman and Baker failed to reply.

550. On June 21, 2005, Plaintiff Richard Fileccia sent Brafman and Baker a certified letter that enclosed a NYS Department of Taxation and Finance collection notice that pertained to mail that was stolen by ADA Frey's operatives inside the United States Postal Service. Defendants Brafman and Baker failed to reply.

551. On June 22, 2005, Defendant Baker offered Plaintiff Richard Fileccia a "chunk of money back" from his retainer if he would plead guilty to a crime.

552. On July 7, 2005, Baker informed Plaintiff Robert J. Fileccia, Esq. that he and Brafman were not tax lawyers and were "uncomfortable" answering the Tax Department's collection notice that Richard Fileccia sent them on June 21, 2005.

553. Investigations reveals that Brafman and Baker's "uncomfortable" tax collection notice relates to Count 5 of the Tax Indictment that was fabricated by ADA Frey's mail theft ring who intercepted and destroyed the preceding eight (8) tax notices that were sent to the Plaintiffs' residence *before* the collection notice.  The eight tax notices were stolen *before* presentation to a grand jury in the Tax Indictment.  Brafman and Baker's "uncomfortable" tax collection notice was delivered years *after* indictment.

554. Based upon the foregoing, Defendants Brafman and Baker asked for and accepted a one

hundred fifty thousand dollar ($150,000) retainer from the Plaintiffs under false and fraudulent pretenses.

555. On July 14, 2005, in a recorded conversation, Plaintiff Richard Fileccia told Baker that Robert J. Fileccia, Esq. was going to initiate a federal mail fraud investigation against ADA Frey. Within hours of this conversation, the United States Postal Service issued a "Notice of Removal" dated July 14, 2005 against Letter Carrier Gabriel Cruz that falsely accused the innocent mailman of "Delaying First Class Mail" on his Castleton Avenue route where the Plaintiffs' former office building was located. ADA Frey and his operatives were targeting mailman Gabriel Cruz for the crimes they committed.

556. Immediately thereafter, Defendants Brafman and Baker "laid down". They deliberately failed and refused to file critical motions in both pending indictments (Ind. Nos. 62/2002 and 23/2004) in violation of their contractual, ethical and fiduciary responsibilities, including:

    a) Failed to prepare or file a 2-page warrantless search and seizure motion that would have ended the Tax Indictment;

    b) Failed and <u>refused</u> to file a motion for court-ordered discovery;

    c) Failed to notify the Court of ADA Frey's then suspected mail theft operation;

    d) Failed to move for specific Brady material;

    e) Failed to prepare substantive motions, including those attacking the integrity of the Indictments based upon the prosecutor's fabrication of evidence during the investigatory stage of the proceedings.

557. The Plaintiffs respectfully incorporate by reference the *pro se* Plaintiffs' September 12, 2005 motion to Judge Rienzi (Ind. Nos. 62/2002 and 23/2004) requesting, among other

things, an order "compelling defense attorneys Benjamin Brafman and Mark Baker to release moneys they are wrongfully withholding in violation of their contractual and professional obligations, specifically a $150,000 retainer previously tendered by Robert and Richard Fileccia, pursuant to this Court's inherent and statutory power to regulate the practice of law."

558. Defendants Brafman and Baker failed and refused to refund any of their unearned $150,000 retainer that they asked for and accepted under false and fraudulent pretenses.

559. Based upon the foregoing and other evidence, Defendants Brafman and Baker conspired and acted in concert with ADA Frey, ADA Varriale, and ADA Mattei to maintain the Plaintiffs' malicious prosecution in violation of their Fourth Amendment constitutional right not to be maliciously prosecuted, Sixth Amendment right to effective assistance of counsel, Sixth Amendment right to a fair trial; and constitutional right of access to the courts.

560. Defendant ADA Frey knowingly and intentionally targeted Brafman and Baker to disqualify their law firm in violation of the Plaintiffs' Fourth Amendment constitutional right not to be maliciously prosecuted, Sixth Amendment right to effective assistance of counsel, Sixth Amendment right to a fair trial; and constitutional right of access to the courts.

561. Defendants Brafman and Baker, and their law firm(s) were grossly negligent for failing to take the necessary precautions to prevent ADA Frey from interfering with their contractual and fiduciary obligations and relationship with the Plaintiffs.

562. Defendants Brafman and Baker knowingly and intentionally breached their contract with the Plaintiffs.

563.   Defendants Brafman and Baker knowingly and intentionally breached their fiduciary duty to the Plaintiffs.

564.   Defendants Brafman and Baker knowingly and intentionally breached their ethical responsibilities to the Plaintiffs.

565.   Defendants Brafman and Baker breached the plaintiffs' attorney client privilege.

566.   The Plaintiffs repeat the foregoing Brafman and Baker allegations against Brafman & Ross, P.C. and Brafman and Associates, P.C.

Alex Shulman, Esq., Stand-by Counsel.

567.   On November 25, 2005, Judge Leonard Rienzi assigned legal aid lawyer Alex Shulman to be Plaintiff Robert Fileccia's *standby* counsel after having certified him to be indigent.

568.   The record evidence indicates that Judge Rienzi handpicked Shulman to:

   a)   surreptitiously undermine Robert Fileccia's defense;

   b)   maintain the Plaintiff's malicious continuing seizure;

   c)   strip the Plaintiff of his constitutional right to effective assistance of counsel; and

   d)   conduct counterintelligence activities for prosecutors.

569.   Almost immediately, Defendant Shulman confessed that he is not a tax lawyer; did not have any tax experience; did not file his own tax returns; did not have a fax machine; did not have access to the internet; did not have a computer; did not perform computerized legal research; and did not want to represent the Plaintiff in any capacity.

570.   Defendant Shulman also admitted that he was personal friends with ADA Mario Mattei and his office, "hung around" with them, and was "surprised" that Judge Rienzi assigned him.  Shulman warned Robert Fileccia that if he were to subpoena any of the ADAs to

testify, Shulman "would sit there like a potted plant."

571.    However, notwithstanding Shulman's irreconcilable conflict of interest, inability, and unwillingness to help Robert Fileccia defend himself, he waited six months to make a motion to be relieved as counsel in order to give prosecutors an opportunity and tactical advantage to maliciously prosecute the Plaintiff.

572.    On June 13, 2006, Shulman filed a materially false and misleading attorney affirmation dated June 12, 2006 in the Richmond County Supreme Court to be relieved as counsel.

573.    Defendant Shulman compiled twenty two (22) pages of false and misleading averments designed to maliciously discredit the Plaintiff, protect the prosecutors, and undermine Robert Fileccia's defense.

574.    For example, Shulman characterized Robert Fileccia's meritorious defense to the Tax Indictment as "repugnant" suggesting that it was fraudulent or otherwise unlawful.

575.    When the Plaintiff confronted Shulman and informed him that all of their conversations were recorded, Shulman panicked and physically removed his sloppy hand-written motion from the Supreme Court Clerk's Office, which is a crime.   A lawyer may withdraw a motion, not remove it from the Supreme Court building.

576.    Shulman prepared a second materially false and misleading affirmation on July 11, 2006.

577.    Shulman prepared a third materially false and misleading affirmation on August 22, 2006.

578.    On November 14, 2006, Shulman made a fourth attempt to undermine and discredit the Plaintiff.   This time, Shulman made materially false and misleading statements on the record in open court, claiming that Robert Fileccia did not want to try the tax indictment "on its merits", which implied that the fabricated tax charges had merit and that the